E. I. du PONT de NEMOURS &
COMPANY, Appellant,

v.

BERKLEY AND COMPANY,
INC., Appellee.

E. I. du PONT de NEMOURS &
COMPANY, Appellee,

v.

BERKLEY AND COMPANY,
INC., Appellant.

Nos. 79–1219, 79–1231.

United States Court of Appeals,
Eighth Circuit.

Submitted Sept. 12, 1979.

Decided Feb. 13, 1980.

Rehearing and Rehearing En Banc
Denied March 17, 1980.

---

7. Defendant Carey's March 5, 1980 motion to dismiss the appeal is thus denied.

John O. Tramontine, Fish & Neave, New York City (argued), Charles R. Wolle, Shull, Marshall & Marks, Sioux City, Iowa, Robert C. Morgan, and Christopher K. Hu, New York City, on brief, for E. I. du Pont, etc.

Dennis W. Johnson and David W. Belin, Des Moines, Iowa (argued), Orrin M. Haugen and Thomas Nikolai, Haugen & Nikolai, Minneapolis, Minn., Belin, Harris, Helmick & Lovrien, Des Moines, Iowa, and William J. Rawlings, Kindig, Beebe, McCluhan, Rawlings & Nieland, Sioux City, Iowa, on brief, for Berkley and Co., Inc.

Before BRIGHT and HENLEY, Circuit Judges, and MARKEY, Chief Judge *.

MARKEY, Chief Judge.

E. I. du Pont de Nemours & Company (DuPont) appeals from a judgment holding invalid its United States patent No. 3,063,189 (DuPont patent). Berkley & Company, Inc. (Berkley) appeals the dismissal of its antitrust counterclaim and denial of its motion for attorney's fees and costs. We reverse the judgment of invalidity, remand for a new trial on that issue, and affirm the dismissal of the counterclaim.[1]

## Background

The patent in suit, like most patents, discloses a proposed solution for a problem. When colored fishing lines are used, to enable the fisherman to see them above water, the lines are thought to be visible underwater to the fish.[2] When transparent lines are used, to limit visibility to fish, the fisherman can't see the lines resulting in tangled lines when several are used from one boat.

The solution proposed by Ed Keller, DuPont's employee, was a fishing line containing fluorescent dye. The dye would be activated, i.e., the line would glow, in response to the ultraviolet component of daylight, making it "visible above water." At the same time, because water would absorb the dye-activating ultraviolet component of daylight, the line would be "relatively invisible" below the water. Thus one line would have the characteristics of high visibility above water and low visibility below water. Keller filed a U.S. patent application on January 2, 1962. DuPont introduced its fluorescent dyed line to the marketplace in August, 1962. The DuPont patent issued on November 13, 1962[3] to DuPont, Keller's assignee.

---

* The Honorable Howard T. Markey, Chief Judge, United States Court of Customs and Patent Appeals, sitting by designation.

1. An award of fees and costs being available only to a prevailing party, 35 U.S.C. § 285 (1976); Fed.R.Civ.P. 54(d), consideration of Berkley's claim of error in denial of its attorney's fees and costs in defending the infringement suit is premature. Berkley may renew its claim for attorneys fees and costs if it prevails on retrial.

2. The record is silent on how and what fish see.

3. The patent expired on November 13, 1979.

In November 1962, Berkley began making and selling a fluorescent fishing line, but ceased in 1963 when DuPont gave notice of infringement. Berkley's subsequent efforts to produce a "High Visibility" line that would not infringe were unsuccessful, its use of anthanilic acid producing a line half as bright as DuPont's. In December 1974, after unproductive licensing discussions with DuPont, Berkley again began making and selling a fluorescent fishing line.

On August 1, 1975, DuPont sued Berkley for willful infringement of claims 1, 2, 5, 6 and 8 of the DuPont patent. Berkley denied infringement throughout a three-year discovery period, asserting that its line contained an "optical brightener" in place of fluorescent dye. Two weeks before trial, Berkley admitted that claims 2, 5 and 6, if valid, were infringed by its product. DuPont thereupon deleted claims 1 and 8 from its charge of infringement.

For its defense, Berkley alleged (1) that the DuPont patent was invalid for lack of utility, novelty and nonobviousness, and (2) that the patent was rendered invalid by DuPont's fraudulent conduct before the U.S. Patent and Trademark Office (PTO).

For its counterclaim, Berkley alleged that DuPont violated Section 2 of the Sherman Act by procuring the patent through fraud and by attempting to enforce the patent with knowledge of its invalidity.[4]

Over Berkley's objection, the trial court ordered a bifurcated trial, the first part to include the allegations that DuPont obtained the patent by fraud and enforced it believing it invalid. The second part, on the remaining elements of the antitrust claim, would be held if the jury found for Berkley on fraud or enforcement.

■ Following a three-week trial, the jury returned a general verdict for Berkley on DuPont's infringement claim. The jury answered these, and only these, special interrogatories:[5]

Q: Did plaintiff obtain the . . . [DuPont] patent from the patent office by fraud?

A: No.

Q: Did plaintiff assert its patent against Berkley knowing that it was invalid?

A: No.

Q: Did you find for defendant solely because the patent was obvious?

A: No.

The court entered judgment, holding the DuPont patent invalid and dismissing the complaint and counterclaim. Both parties filed, and the court denied, motions for judgment notwithstanding the verdict or for a new trial.

### Issues

Embittered in battle below, the parties request this court to resolve over 25 issues and subissues. The trial court is directly charged with 11 reversible errors. Couched in accusatory and turgid terminology, the briefs set forth numerous bits and pieces of conflicting testimony and documentary evidence, from which we are asked to draw a plethora of factual inferences. The effect is neither a prejudicing of this court,

---

4. Berkley mistakenly says it filed its counterclaim "promptly" upon discovering the bases therefore. All of those bases were known to it at least 18 months before it filed its counterclaim. The magistrate described timeliness of the filing as "extremely tenuous."

5. The court refused DuPont's request for specific interrogatories requiring the jury's grounds for its verdict of invalidity. Though detailed jury findings would have been preferable, and might have avoided a retrial in this case, the refusal was not itself reversible error. A jury is not required to make the extensive factual findings required of a judge under Fed. R.Civ.P. 52(a). *Panther Pumps & Equipment*

Co. v. Hydrocraft, Inc., 468 F.2d 225, 227–28 (7th Cir. 1972), cert. denied, 411 U.S. 965, 93 S.Ct. 2143, 36 L.Ed.2d 685 (1973).

Whatever the considerations and concerns involved in current discussions of juries in complex litigation, use of interrogatories and special verdicts, from which the parties and an appellate court may glean the basis for the verdict, would appear to alleviate at least some of those concerns in some cases. The trial court's denial of DuPont's request for special verdicts in this case, for example, has forced this court to review every possible basis for the jury's verdict.

against either side, nor a simplifying clarification. The result is a necessarily extended opinion, based on a searching review of an entire 4000 page record, and in which the issues treated will appear in section headings.[6]

## OPINION

### I. *Validity*

#### A. *Requirement for Retrial*

■ Absent error affecting the substantial rights of the parties, neither reversal nor a new trial is required. 28 U.S.C. § 2111 (1976); Fed.R.Civ.P. 61.[7] When the error misled the jury or had a probable effect on its verdict, reversal and a new trial are appropriate. *International Merger & Acquisition Consultants, Inc. v. Armac Enterprises, Inc.*, 531 F.2d 821, 823 (7th Cir. 1976); *Conway v. Chemical Leaman Tank Lines, Inc.*, 525 F.2d 927, 929–30 (5th Cir. 1976); *Hoffman v. Sterling Drug, Inc.*, 485 F.2d 132, 140 (3d Cir. 1973); *See Kotteakos v. United States*, 328 U.S. 750, 764–65, 66 S.Ct. 1239, 1247–1248, 90 L.Ed. 1557 (1946).

Respecting the issue of patent validity under the statute, the court asked the jury to state only whether it found for Berkley "solely" on obviousness. The jury's "No" answer means that there were six possible bases for its verdict: (1) the invention would have been obvious *and* was lacking in utility, (2) the invention would have been obvious *and* was lacking in novelty, (3) the invention would have been obvious *and* was lacking in both utility and novelty, (4) the invention would not have been obvious, *but* was lacking in utility, (5) the invention would not have been obvious, *but* was lacking in novelty, or (6) the invention would not have been obvious, *but* was lacking in novelty and utility.

■ If one or more substantial grounds for the verdict presented no jury question and should have been decided as a matter of law in DuPont's favor, reversal and a new trial are required, notwithstanding the presence of other grounds that could have supported the verdict. *Morrissey v. National Maritime Union*, 544 F.2d 19, 26–27 (2d Cir. 1976); *Albergo v. Reading Co.*, 372 F.2d 83, 85–86 (3d Cir. 1966), *cert. denied*, 386 U.S. 983, 87 S.Ct. 1284, 18 L.Ed.2d 232 (1967); *Fatovic v. Nederlandsch-Ameridaansche Stoomvaart*, 275 F.2d 188, 190 (2d Cir. 1960); *North American Graphite Corp. v. Allan*, 87 U.S.App.D.C. 154, 156, 184 F.2d 387, 389 (D.C. Cir. 1950); *Traveler's Insurance Co. v. Wilkes*, 76 F.2d 701, 705 (5th Cir.), *cert. denied*, 296 U.S. 604, 56 S.Ct. 120, 80 L.Ed.2d 428 (1935); *Patton v. Wells*, 121 F. 337, 340 (8th Cir. 1903). *See also Sunkist v. Winckler & Smith Co.*, 370 U.S. 19, 29–30, 82 S.Ct. 1130, 1135–1136, 8 L.Ed.2d 305 (1962) (erroneous instruction); *United Pilots Ass'n v. Halecki*, 358 U.S. 613, 619, 79 S.Ct. 517, 520, 3 L.Ed.2d 541 (1959) (failure to submit jury question); *Maryland v. Baldwin*, 112 U.S. 490, 493, 5 S.Ct. 278, 279, 28 L.Ed. 822 (1884) (admission of evidence). The utility issue presented no jury question

---

**6.** The briefs contain repeated charges and countercharges of factual misstatements, each requiring resolution. An example of unnecessary burden-making is a mischaracterization and misquote of a prior Court opinion, followed not by a phone call and immediate scratching of the quote, but by a strong attack, an apology and explanation, an attack on the explanation, and final assertion that the source is unknown. The limit-lines of zeal are not always clear, but the judicial process is not aided by unnecessary forays into causes of carelessness.

**7.** 28 U.S.C. § 2111 (1976) provides:
§ 2111. Harmless error
 On the hearing of any appeal or writ of certiorari in any case, the court shall give judgment after an examination of the record without regard to errors or defects which do not affect the substantial rights of the parties.

Fed.R.Civ.P. 61 provides:
 Rule 61. Harmless Error
 No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.

and should have been decided as·a matter of law in DuPont's favor. Its submission to the jury, in the circumstances of this case, requires a retrial of the validity issue.[8]

Berkley concentrated its briefs and oral argument on non-utility, fraud, knowing enforcement of an invalid patent, gross negligence, inequitable conduct, and anti-competitive intent, believing, says Berkley,· that that evidence shows the patent invalid. Having viewed all of the evidence on validity most favorably to Berkley, and having given Berkley the benefit of every reasonable inference, *Davis v. Burlington Northern, Inc.*, 541 F.2d 182, 186 (8th Cir.), *cert. denied*, 429 U.S. 1002, 97 S.Ct. 533, 50 L.Ed.2d 613 (1976), we cannot say on this record, and in view of the errors occurring below, that Berkley carried its burden of proving the DuPont patent invalid.[9] DuPont argues for a' judgment that its patent is valid. For the reasons discussed *infra*, we decline to enter that judgment on this appeal. To avoid a potential miscarriage of justice, *Firemans Fund Insurance Co. v. Aalco Wrecking Co., Inc.*, 466 F.2d 179, 187 (8th Cir. 1972), we remand for retrial of the validity issue.

### B. Utility

■ Though the trial court instructed the jury that an invention must "operate or function in the manner claimed," and also that an invention "need not work perfectly in order to be useful," the treatment of the utility issue at trial, beyond any error in instructions thereon,[10] was fatally flawed.

The complaint originally asserted infringement of five claims:

1. A fishing line, formed of a synthetic plastic material, which is oriented at least to a point such that a stretching of 100% would cause the line to break, which line contains a fluorescent dyestuff, which glows on being exposed to ultraviolet light, and which rapidly ceases to glow upon removal of ultraviolet light.

2. An oriented polyamide, monofilament fishing line containing a fluorescent dyestuff which glows when exposed to ultraviolet light, which line has been stretched from 4½ to 6 times its original length.

5. The fishing line of claim 2 in which the fluorescent dyestuff is present in from 0.05 to 0.5 wt. percent of the fishing line and is intimately mixed throughout the thickness of the said fishing line.

6. The fishing line of claim 5 in which the polyamide contains polymerized caprolactam.

8. The fishing line of claim 1 in which the dyestuff is distributed throughout the plastic.

■ It is axiomatic that "one who appropriates the teachings of a patent may not deny the utility of the invention." *Tapco Products Co. v. Van Mark Products Corp.*, 446 F.2d 420, 428 (6th Cir.), *cert. denied*, 404 U.S. 986, 92 S.Ct. 451, 30 L.Ed.2d 370 (1971); *Monogram Manufacturing Co. v. Glemby*, 136 F.2d 961, 963 (2d Cir.),. *cert. denied*, 320 U.S. 778, 64 S.Ct. 93, 88 L.Ed. 467 (1943); *Kansas City Southern Railway v. Silica Products Co.*, 48 F.2d 503, 505 (8th Cir.), *cert. denied*, 284 U.S. 626, 52 S.Ct. 11, 76 L.Ed. 533 (1931). Hence, the first flaw was the failure to recognize that Berkley's admission, that its fishing line fell within

---

8. A new trial will not result where it is reasonably certain that the jury was not significantly influenced by issues erroneously submitted to it. *See Gardner v. General Motors Corp.*, 507 F.2d 525, 529 (10th Cir. 1974); *Collum v. Butler*, 421 F.2d 1257, 1260 (7th Cir. 1970); *Roginsky v. Richardson-Merrell, Inc.*, 378 F.2d 832,· 837–38 (2d Cir. 1967). For the reasons set forth in the text, no such reasonable certainty is possible here.

9. In objecting to DuPont's request for interrogatories requiring the jury to state the basis of its verdict, counsel for Berkley stated "It is

Berkley's problem to support the verdict in the Court of Appeals, and if there is an erroneous example as to any aspect of the case, that's going to be Berkley's problem. If there is no evidence on some part of the case that went to the jury, that will be Berkley's problem."

10. DuPont's requested instruction, i.e., that lack of utility means the invention is "incapable of achieving any of the aims of the patent under any conditions," expresses the legal test for utility more clearly and precisely· than that given by the trial court. *Infra* note 17.

the scope of claims 2, 5 and 6, is an admission of utility in the invention there claimed and that Berkley, as an infringer, was thereby estopped from asserting that those claims are invalid for lack of utility.[11]

■ The second flaw was the failure to recognize that the presumption of utility created by issuance of the patent, 35 U.S.C. § 282, *Dashiell v. Grosvenor,* 162 U.S. 425, 432, 16 S.Ct. 805, 807, 40 L.Ed. 1025 (1896); *Strong-Scott Manufacturing Co. v. Weller,* 112 F.2d 389, 394 (8th Cir. 1940); *Metropolitan Engineering Co. v. Coe,* 64 App.D.C. 315, 317, 78 F.2d 199, 201 (D.C. Cir. 1935); *Superior Hay Stacker Manufacturing Co. v. Dain Manufacturing Co.,* 208 F. 549, 557 (8th Cir. 1913), is strengthened when others, as Berkley did here, have copied the invention, *Superior Hay Stacker Manufacturing Co. v. Dain Manufacturing Co., id.* at 557, and when, as it did here in both DuPont's and Berkley's hands, the invention has achieved commercial success, *Western Electric Co. v. LaRue,* 139 U.S. 601, 608, 11 S.Ct. 670, 672, 35 L.Ed. 294 (1891); *Continental Can Co. v. Anchor Hocking Glass Corp.,* 362 F.2d 123, 124 (7th Cir. 1966); *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.,* 298 F.Supp. 435, 442 (W.D.Mich.1969), *aff'd,* 430 F.2d 221 (6th Cir. 1970), *cert. denied,* 401 U.S. 939, 91 S.Ct. 932, 28 L.Ed.2d 218 (1971).

Berkley, for the first time on appeal, says its non-utility position relates to the "ceases to glow" language of withdrawn claims 1 and 8.[12] The evidence respecting utility was insufficient, however, for any purpose.

The assertion of non-utility rests on the limited excitability of fluorescent dyes by the "visible" component of sunlight; hence, says Berkley, DuPont's line does not entirely cease to glow as long as visible light is present. Berkley then defines relative invisibility under water as less visibility than non-fluorescent line, and says DuPont's line fails that objective because sufficient visible light penetrates clear water to excite the fluorescent dye in the line.[13]

Berkley introduced photographs taken in clear water (the Crystal River and the Bermuda Triangle), and purportedly showing DuPont's line more visible than non-fluorescent lines at depths as great as 100 feet,[14] along with narrated movies of similar scenes. Berkley's witness Lau said DuPont's line "glows all the way down to the bottom. . . . It glows like a light bulb." Roberts said the DuPont line was visible underwater.[15]

DuPont countered with the Johnson report, comparing the relative visibility of DuPont's fluorescent line and a similar but non-fluorescent nylon monofilament line in six different types of water, and with witnesses Shields and Cullerton, who said DuPont's line lost fluorescence inches below the surface of Lake McBride. Johnson's

11. DuPont brought the fact of estoppel to the trial court's attention in a pretrial submission of 'proposed instructions. Berkley's briefs make no reference to the rule of law estopping an admitted infringer from asserting non-utility, or the rule of a strengthened presumption of utility when the invention is copied and becomes a commercial success.

12. Claims 1 and 8 were present below on a theory that their prosecution involved fraud on the PTO. The distinction from claims charged to have been infringed was not, however, made clear by the parties at trial.

13. Berkley does not challenge the patent's assertion that the fluorescent-dyed line is more visible above water, *i. e.,* to the fisherman, than is transparent line. Though Berkley argues that DuPont must be held strictly to the language of the claims in relation to prior art, it

relies on its interpretation of the specification for its argument that the invention fails to meet Keller's objectives and thus lacks utility.

14. DuPont challenges the evidence, pointing to the treatment of the fluorescent line during manufacture, giving it a milky appearance and making it more visible than the untreated "control" line, even when it is *not* fluorescing, as conceded in court by Berkley's patent expert.

15. DuPont points to Lau's statement that Berkley lines made per the DuPont patent showed a "sharp visibility drop-off . . . at modest depths" and were "difficult to detect" at a depth of 15 feet in crystal clear water, and to Roberts' equivocal indication on redirect that "It stops glowing" and "I don't really think it stops glowing."

tests showed that the depth at which fluorescent and non-fluorescent lines appear identical varies from 7″ for turbid seawater to more than 400″ for distilled water. Dr. Johnson testified that his test results were consistent with the visibility language in the DuPont patent, which nowhere asserts that the submerged line is less visible than some other line. DuPont also introduced the McNally report, stating that DuPont's fluorescent line and a nonfluorescent line appeared identical at a depth of 5 feet in a lake "clearer than the average fishing lake."

Non-utility of the invention is not established by the recitation in claims 1 and 8 that the dye "rapidly ceases to glow upon removal of ultraviolet light," when the claims are read, as they must be read, in their entirety.[16] The claims and the patent nowhere mention visible light. Ultraviolet light is the sole glow-activating agent recited. One skilled in the art, reading the entire claim, and not charged with its infringement, would find the reasonable interpretation of the functional "ceases to glow" claim limitation to be that the glow

produced by ultraviolet light rapidly ceases when that light is removed.

Perfection under all conditions is not required,[17] whether the patent does or does not suggest that the invention is imperfect or inoperable under certain conditions. *See Conner v. Joris, supra* note 17, at 946–48; 44 CCPA at 775–76; *Plant Products Co. v. Charles Phillips Chemical Co., supra* note 17, at 586. Dr. Johnson's report showed the DuPont line no more visible than non-fluorescent line under some water conditions. Berkley did not challenge those test results, but relied on *ex parte* tests it conducted exclusively in crystal clear water. Assuming that Berkley's evidence establishes what it claims, *i. e.*, that DuPoint's line is more visible than non-fluorescent line in crystal clear water, that evidence is insufficient as a matter of law to establish non-utility. At most, it might demonstrate that DuPont's commercial embodiment of the invention does not work perfectly under a particular condition and is thus not a model of perfection.

It is instructive on the issue of utility that any imperfections respecting some continued glow under visible light in clear water did not deter Berkley from copying

---

**16.** The claims measure the invention, *Graver Tank & Manufacturing Co. v. Linde Air Products Co.*, 336 U.S. 271, 277, 69 S.Ct. 535, 538, 93 L.Ed. 672 (1949); *Smith v. Snow*, 294 U.S. 1, 11, 55 S.Ct. 279, 283, 79 L.Ed. 721 (1934); but the invention must be viewed "as a whole," *Parker v. Flook*, 437 U.S. 584, 594, 98 S.Ct. 2522, 2528, 57 L.Ed.2d 451 (1978).

**17.** A small degree of utility is sufficient. *In re Oberweger*, 115 F.2d 826, 828, 28 CCPA 749, 752 (1940). The claimed invention must only be capable of performing *some* beneficial function. *National Slug Rejectors, Inc. v. A.B.T. Manufacturing Corp.*, 164 F.2d 333, 335 (7th Cir. 1947), *cert. denied*, 333 U.S. 832, 68 S.Ct. 459, 92 L.Ed. 1116 (1948); *In re Oberweger, supra* at 828; 28 CCPA at 752; *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc., supra* at 435. An invention does not lack utility merely because the particular embodiment disclosed in the patent lacks perfection or performs crudely. *Hildreth v. Mastoras*, 257 U.S. 27, 34, 42 S.Ct. 20, 23, 66 L.Ed. 112 (1921); *Decca Ltd. v. United States*, 544 F.2d 1070, 1077, 210 Ct.Cl. 546 (1976); *Field v. Knowles*, 183 F.2d 593, 600, 37 CCPA 1211, 1221 (1950); *Plant Products Co. v. Charles Phillips Chemical Co.*, 96 F.2d 585, 586 (2d Cir. 1938); *Besser v. Merrilat*

*Culvert Core Co.*, 243 F. 611, 612 (8th Cir. 1917). A commercially successful product is not required. *Hildreth v. Mastoras, supra* at 34, 42 S.Ct. at 23; *In re Anthony*, 414 F.2d 1383, 1396, 56 CCPA 1443, 1460 (1969). Nor is it essential that the invention accomplish all its intended functions, *Conner v. Joris*, 241 F.2d 944, 947, 44 CCPA 772, 776 (1957), *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc., supra* at 442, or operate under all conditions, *Decca Ltd. v. United States, supra* at 1077, partial success being sufficient to demonstrate patentable utility, *Freedman v. Overseas Scientific Corp.*, 248 F.2d 274, 276 (2d Cir. 1957), *Emery Industries, Inc. v. Schumann*, 111 F.2d 209, 210 (7th Cir. 1940), *Cummins Engine Co. v. General Motors Corp.*, 299 F.Supp. 59, 90 (D.Md.1969), *aff'd*, 424 F.2d 1368 (4th Cir. 1970). In short, the defense of non-utility cannot be sustained without proof of total incapacity. *Scovill Manufacturing Co. v. Satler*, 21 F.2d 630, 634 (D.Conn.1927). Proof of inoperativeness or non-utility must be strong, *Steinfur Patents Corp. v. William Beyer, Inc.*, 62 F.2d 238, 240 (2d Cir. 1932), every reasonable doubt being resolved in favor of the patentee, *Strong-Scott Manufacturing Co. v. Weller, supra* at 394.

the invention and selling it for over 7½ million dollars during 1976–1978.[18]

Thus, the issue of whether the patent was invalid for lack of utility should not have gone to the jury and should have been decided as a matter of law in DuPont's favor. Its submission, for any purpose, constituted prejudicial error.

### C. Novelty

■ A patent is invalid under 35 U.S.C. §§ 102(a)–102(b)[19] if the claimed invention was "known or used by others" in this country prior to the patentee's invention or was "in public use or on sale" in this country more than one year before the application for the patent was filed. The burden of proof of a prior use is satisfied only by evidence clear, cogent, and convincing. See The Barbed Wire Patent, 143 U.S. 275, 284, 12 S.Ct. 443, 447, 36 L.Ed. 154 (1892); Julian v. Drying Systems Co., 346 F.2d 336, 338 (7th Cir. 1965); McCullough Tool Co. v. Well Surveys, Inc., 343 F.2d 381, 394 (10th Cir. 1965), cert. denied, 383 U.S. 933, 86 S.Ct. 1061, 15 L.Ed.2d 851 (1966); Atlas v. Eastern Air Lines, Inc., 311 F.2d 156, 160 (1st Cir. 1962), cert. denied, 373 U.S. 904, 83 S.Ct. 1290, 10 L.Ed.2d 199 (1963).

■ Oral testimony alone has been held insufficient to prove a prior use, Zachos v. Sherwin-Williams, Co., 177 F.2d 762, 763 (5th Cir. 1949). The more widespread view, however, is that unsupported oral testimony can be sufficient but must be regarded with suspicion and subjected to close scrutiny. Miner v. T. H. Symington Co., 250 U.S. 383, 386, 39 S.Ct. 542, 543, 63 L.Ed. 1045 (1919); Deering v. Winona Harvester Works, 155 U.S. 286, 300, 15 S.Ct. 118, 123, 39 L.Ed. 153 (1894); Jones Knitting Corp. v. Morgan, 361 F.2d 451, 455 (3d Cir. 1966); Becker v. Electric Service Supplies Co., 98 F.2d 366, 368 (7th Cir. 1938); Farmhand, Inc. v. Lahman Manufacturing Co., 192 U.S. P.Q. 749, 755 (D.S.D.1976), aff'd, 568 F.2d 112 (8th Cir.), cert. denied, 436 U.S. 913, 98 S.Ct. 2254, 56 L.Ed.2d 414 (1978); See The Barbed Wire Patent, supra, at 284–85, 12 S.Ct. at 447; Eibel Process Co. v. Minnesota & Ontario Paper Co., 261 U.S. 45, 60, 43 S.Ct. 322, 327, 67 L.Ed. 523 (1923).[20]

### (1) The McCoy Line

In 1964, DuPont learned of a chartreuse fluorescent "Glo-Line" being sold by John McCoy in Seattle. McCoy told Greenwood, a DuPont salesman sent to investigate, that DuPont's 1949 records should contain inquiries from McCoy respecting fluorescent dyes useful in nylon. Greenwood found a sample of DuPont fluorescent dye, dated December 1949, in McCoy's possession. Greenwood's call reports reflect McCoy's allegations of having dyed nylon for over 15 years. McCoy said he had dyed yarn for lures since 1924. In a 1964 letter, McCoy said he had processed his Glo-Line since

---

**18.** At oral argument, it was admitted that Berkley did not tell its customers that its copy of the invention lacked utility.

**19.** § 102. Conditions for patentability; novelty and loss of right to patent

A person shall be entitled to a patent unless—

(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, or

(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States . . . .

**20.** Factors considered in determining the sufficiency of oral testimony are: (1) delay between event and trial, (2) interest of witness, (3) contradiction or impeachment, (4) corroboration, (5) witnesses' familiarity with details of alleged prior structure, (6) improbability of prior use considering state of the art, (7) impact of the invention on the industry, and (8) relationship between witness and alleged prior user. See Deering v. Winona Harvester Works, supra at 300–01, 15 S.Ct. at 123–124; Jones Knitting Corp. v. Morgan, supra at 456; A.J. Industries, Inc. v. Dayton Steel Foundry Co., 394 F.2d 357, 361 (6th Cir. 1968); Whiteman v. Mathews, 216 F.2d 712, 716 (9th Cir. 1954); Becker v. Electric Service Co., supra at 368; Farmhand, Inc. v. Lahman Manufacturing Co., supra at 755; A. B. Dick Co. v. Simplicator Corp., 34 F.2d 935, 939–40 (2d Cir. 1929); Eibel Process Co. v. Minnesota & Ontario Paper Co., supra at 60, 43 S.Ct. at 327; Smith v. Hall, 301 U.S. 216, 222, 57 S.Ct. 711, 714, 81 L.Ed. 1049 (1937).

1949. He said he made chartreuse fishing line "for the last two years or longer." In 1965, McCoy said he used the 1949 dye on lines for tying nymphs. In 1975, McCoy gave a written statement that he had first sold fluorescent fishing line in late 1964.

Five witnesses (3 live, 2 by deposition) said they had seen or sold McCoy's fluorescent chartreuse fishing line at least once in the mid-1950's. Kawahara said he sold it in his Seattle store before the 1958 introduction of DuPont's non-fluorescent line. Severeid said he saw McCoy's chartreuse line in Kawahara's store before transferring to his new office in August 1958. Sivertsen said he saw McCoy's chartreuse line before moving into his new store in 1957. Schalkle said he saw McCoy's chartreuse line before his transfer to a new job in 1954. Earling said he saw McCoy's chartreuse line about the time he was married in 1954.

Thus five witnesses claiming to have seen McCoy's chartreuse fishing line testified from memory to events of twenty years past. Though accompanied by reference to concurrent events, their testimony was inconsistent with the evidence produced by McCoy, the alleged prior user, whose one consistent indication was that his earliest claimed use of chartreuse fishing line was after Keller's invention, and who in 1964 possessed no chartreuse dye manufactured prior to 1963. Severeid, Sivertsen, Schalkle and Earling had no corroborating documentary or physical evidence. All five witnesses said they saw only McCoy's chartreuse line, and though all said they saw it between 1954 and 1958, Berkley declined to review McCoy's available and offered sales records for 1952 through 1958. McCoy identified a 1964 invoice (two years after the DuPont patent issued) as representing one of his first sales of fluorescent line. McCoy's 1954 ad did not mention fluorescent fishing line, and his 1949 dye sample does not evidence use of fluorescent dye in a fishing line. The only physical evidence produced was a spool of line Kawahara said was one of the first he had purchased, and

DuPont's unchallenged tests proved that line had not been made prior to 1962.[21]

 Berkley thus failed as a matter of law to carry its burden of proving prior use by McCoy. The attempt rests solely on uncorroborated oral testimony concerning events of long ago, contradicted by McCoy himself and by unchallenged results of scientific tests. Judged by appropriate legal standards, that testimony had insufficient probative value to make out a case of prior use that a jury could have found clear and convincing. Thus prejudicial error occurred in the instruction to the jury that it could find the DuPont patent invalid as anticipated by the McCoy line.

### (2) The Cohantic Line

A spool of "Cohantic" line was allegedly discovered by Berkley in a fishing line "morgue" of the Cortland Line Company in New York. Placed under a strong artificial ultraviolet light, the line gave off a faint glow, about 3% of that of DuPont's patented line. The glow was a little more in portions of the spool that had been covered for years by a rubber band and thus protected from light and oxidation. The Cohantic line did not glow in sunlight.

Berkley's expert Stearns compared the glow of the Cohantic line to the inherent glow of a piece of undyed, relatively stiff, fishing leader of unknown composition. Finding a difference in spectra and intensity, Stearns concluded that the glow in the Cohantic line was caused by the presence of a "brightener," by which he apparently meant a fluorescent dye.

DuPont's expert Jenkins found that the glow spectra of the Cohantic line and the inherent glow of undyed line made of the same nylon were substantially identical.

DuPont's request that we find fluorescent dye absent from the Cohantic line, and Berkley's request that we find it present,

21. Berkley says it learned of DuPont's spool tests only a few days before the end of trial, but does not charge the trial court with an abuse of discretion in admitting the testimony.

are inappropriate at this stage.[22] The testimony is equivocal. Neither side conducted scientific tests for the presence of fluorescent dye, though DuPont says the amount, if any, would be too minuscule for scientific testing. That Stearns' comparison line was not of the same nylon, while Jenkins' was, that many materials (assertedly including fingernails), inherently fluoresce under strong artificial ultraviolet light, and that a protected line portion glowed more than an unprotected portion, were matters for the jury, in its evaluation of the credibility and reliability of the witnesses and their testimony.

■ The trial court correctly submitted the evidence of the Cohantic line to the jury. The absence of indication that the jury found the patent invalid because of the Cohantic line, the gaps and conflicts in the Cohantic line evidence, and the prejudicial errors in submission of the non-utility and McCoy line matters, all preclude a sustaining here of the jury's invalidity verdict on the basis of the Cohantic line evidence.

### D. Obviousness

As this court noted in *Woodstream Corp. v. Herter's, Inc.*, 446 F.2d 1143, 1149 (8th Cir. 1971), application of 35 U.S.C. § 103[23], *i.e.*, determination of the obviousness issue, is governed by the principles articulated by the Supreme Court in *Graham v. John Deere Co.*, 383 U.S. 1, 17–18, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1966):

> While the ultimate question of patent validity is one of law, [*Great*] *A. & P. Tea Co. v. Supermarket Equipment Corp.*, [340 U.S. 147, 155, 71 S.Ct. 127, 95 L.Ed. 162, 1955 (1950)] . . . the § 103

condition, which is but one of three conditions, each of which must be satisfied, lends itself to several basic factual inquiries. Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy.

■ Though the ultimate question of obviousness is subject to evaluation on appeal, *Flour City Architectural Met. v. Alpana Aluminum Products, Inc.*, 454 F.2d 98, 106 (8th Cir. 1972); *see Sakraida v. Ag Pro, Inc.*, 425 U.S. 273, 280, 96 S.Ct. 1532, 1536, 47 L.Ed.2d 784 (1976); *Graham v. John Deere Co., supra* at 17, 86 S.Ct. at 693, we decline an independent evaluation on the present record. In the ordinary case, the appellate court has the benefit of the factfinder's conclusion that the invention would or would not have been obvious, and the facts and reasons underlying the conclusion. Here the jury announced no conclusion, either way. There are no findings of fact, and the trial court said it was making no determination of the question.

Even in non-jury cases, where the trial court made no findings or conclusions on obviousness, appellate courts have declined

---

**22.** Claim 5 specifies a particular quantity of dye. There was no evidence concerning any specific amount of dye in the Cohantic line. We indicate no view respecting whether the Cohantic line constitutes a prior use of Keller's invention.

**23.** § 103. Conditions for patentability; non-obvious subject matter.
 A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

the initial determination of that question. As was said in *Cloud v. Standard Packaging Corp.*, 376 F.2d 384, 391 (7th Cir. 1966):

> But, in general, and we think in this case as well, it is sounder procedure for the initial determination to be made in the trial court. That court has advantages not only in determining credibility of those it sees and hears, but it has much greater flexibility, where it deems it desirable, to call counsel before it for colloquy, or to order supplementation of the evidence. And where the determination of this type of issue is first made in the court of appeals, there is no court where the parties can obtain review as a matter of right.
>
> We refrain, therefore, from attempting to decide the matter at this stage, and direct further proceedings in the district court to determine the challenge to all these patents for obviousness under 35 U.S.C.A. § 103. [Footnote omitted.]

*See also Kockum Industries, Inc. v. Salem Equipment, Inc.*, 467 F.2d 61, 64 (9th Cir. 1972), *cert. denied*, 411 U.S. 964, 93 S.Ct. 2140, 36 L.Ed.2d 684 (1973); *Sutherland Paper Co. v. Grant Paper Box Co.*, 183 F.2d 926, 935–36 (3d Cir.), *cert. denied*, 340 U.S. 906, 71 S.Ct. 281, 95 L.Ed. 655 (1950).

 As the Supreme Court said in *Graham*, the obviousness-nonobviousness conclusion rests on factual inquiries, which were to have been resolved in the first instance in this case by a jury. The record reflects extensive conflicts in testimony, and no indication as to how, if at all, the jury resolved those conflicts. These considerations, coupled with errors which appear

to have deprived the jury of a true picture of the issue, dictate the avoidance of potential injustice inhering in an attempted resolution of the required factual inquiries on the basis of the cold paper record before us.

 Having resolved the factual inquiries necessitated by the evidence presented to it, the jury at retrial must, if so requested, then reach a final conclusion respecting obviousness.[24] Avoidance of subjectivity and the insidious effect of hindsight, *i. e.*, resisting "the temptation to read into the prior art" the teachings of Keller's invention, *Graham, supra* at 36, 86 S.Ct. at 703, may prove difficult. Avoiding those analytical defects, the jury may conclude, on the basis of all the evidence, that it would or would not have been obvious to have made Keller's invention in 1961. If that conclusion be accompanied by answers to interrogatories or special verdicts indicating its factual underpinnings, an appeal on the issue may be rendered either unnecessary or more easily managed.

 The parties are entitled to a consideration in the first instance of all the facts touching the obviousness issue, by a factfinder who sees and hears the witnesses, and to that consideration free of the errors that occurred below.[25]

### (1) *The French Line Error*

A fishing line manufactured and sold in France in the 1950's and allegedly identical to DuPont's invention was allowed into evidence. DuPont challenged its admissibility, arguing that the jury would erroneously treat it as evidence of prior art.

---

**24.** Under Rule 402, Fed.R.Evid., all relevant evidence is admissible (unless forbidden by the Constitution, statute, or rule). It would, of course, be unjust, unfair, and unjudicial to ignore any unforbidden evidence relevant to the obviousness-nonobviousness question.

**25.** Though vigorously argued by DuPont, we find no reversible abuse of discretion in admission of the testimony of Berkley's patent law expert. If a patent law expert testifies at retrial, however, care should be taken to avoid

the close skating toward usurpation of court and jury functions illustrated, for example, by:

> [Berkley's expert] Maybe I can satisfy both objections by saying if you find this fishing line to have been used or sold in the 1950's, based on the evidence, then it constitutes prior public use to the extent that it discloses a fishing line which has a fluorescence to it, and meets the terms of the Keller claims. It certainly—If it is prior art—and that is certainly for the jury—the question is

■ If the French line is the same invention as Keller's,[26] it was admitted here under erroneous instructions.

A prior use or sale constitutes "prior art" only if it occurs "in this country." 35 U.S.C. § 102. Hence prior use in a foreign country is not prior art for the purpose of determining obviousness under section 103, and evidence respecting the French line was inadmissible to prove prior art, the line having never been used or sold in this country.

■ In admitting the evidence, the court instructed the jury to consider it "solely as it bears on the *state of the art* and as it relates to the ultimate question of obviousness." (Emphasis ours). That instruction supplied no guidance from which the jury could be expected to have distinguished the French line from the prior art. The court's instruction, considered as a whole, was thus misleading and erroneous.[27]

Berkley's brief mistakenly tells us that the court phrased its instruction in terms of "the skill in the art."[28] The jury, however, would have been no less misled had that been true. The distinction is fine between "prior art" and either "state of the art" or "skill in the art." The possibility of a jury

confusing evidence admitted to show either of the latter with other evidence admitted to show "prior art" weighs heavily against use of a cautionary instruction phrased in the terms here employed.

■ Evidence demonstrating contemporaneous foreign invention by another has been considered even though it does not qualify as prior art. *Stamicarbon, N. V. v. Escambia Chemical Corp., supra* note 28; *Reeves Bros., Inc. v. U. S. Laminating Corp.,* 417 F.2d 869, 872 (2d Cir. 1969). The similarity between contemporaneous invention and prior art dictates, however, that evidence of the former be cautiously admitted in a jury trial. The trial judge must carefully instruct the jury that the evidence is merely one possible indicium of obviousness. *See Reeves Bros., Inc. v. U. S. Laminating Corp., id.,* at 872. That the same invention was contemporaneously made elsewhere may or may not, in the light of all the circumstances, be some indication that the invention would have been obvious, as the statute requires, to "one of ordinary skill in the art." Nothing should be more clear in the law of patents than the concept that the same patentable invention may be contemporaneously made by more than one inventor.[29]

what its application is, and it certainly would be highly relevant prior art.

26. Two French lines were introduced. Only one was apparently alleged to be the same as Keller's invention, an allegation denied by Du-Pont.

27. Confusion was not limited to the jury box:
 Mr. Tramontine [Counsel for DuPont]: Your honor, as I understand the use of the term "state of the art" by counsel [for Berkley], he means equivalent to prior art under Section 103.
 The Court: Right.
 The reference to obviousness in the instruction compounds the error. Preceded by "and", it at best tells the jury it may choose to consider the French line as evidence of the state of the art as distinguished from evidence of obviousness.

28. The trial court referred elsewhere to counsel's statement that the evidence showed the level of skill in the art. Berkley cites one case in which a court said contemporaneous invention is a gauge of the level of skill in the art, *Standun, Inc. v. Polycraft Corp.,* 426 F.Supp.

649, 655–56 (N.D.Ill.1976), *aff'd,* 550 F.2d 395 (7th Cir. 1977). That was, however, a non-jury trial in which the court said it was using evidence of contemporaneous invention merely to "bolster" its earlier conclusion, based solely on the prior art. Berkley's other citation, *Stamicarbon, N. V. v. Escambia Chemical Corp.,* 430 F.2d 920 (5th Cir.), *cert. denied,* 400 U.S. 944, 91 S.Ct. 245, 27 L.Ed.2d 248 (1970), was also a non-jury trial, in which the court admitted evidence of foreign contemporary invention, but found the patent *valid* nonetheless, and stated (at 928) that the evidence "might not be admissible to prove prior art under 35 U.S.C. § 102."

29. The statute establishing interferences in the PTO, 35 U.S.C. § 135, is entirely premised on the concept that the same nonobvious invention may be contemporaneously made by a plurality of inventors. That congressional mandate, and the priority status given in interferences to the first-to-file a patent application, accord with the Constitutional purpose of the patent system, *i. e.,* to encourage public disclosure of inventions in this country.

(2) *The Presumption of Validity Error*

Because the French and Cuculo patents were classified in files searched by the examiner, DuPont sought this instruction:

> It is also assumed that the examiner reviewed the prior art which was in the files which he searched during the prosecution of the application for the patent.

Berkley objected, and the court omitted the requested statement.

 The statutory presumption of validity [30] flows from a congressional assumption that the PTO properly performs its administrative functions. *Morgan v. Daniels*, 153 U.S. 120, 124–25, 14 S.Ct. 772, 773–774, 38 L.Ed. 657 (1894); *see Chicago Rawhide Manufacturing Co. v. Crane Packing Co.*, 523 F.2d 452, 458 (7th Cir. 1975), *cert. denied*, 423 U.S. 1091, 96 S.Ct. 887, 47

L.Ed.2d 103 (1976); *Beckman Instruments, Inc. v. Chemtronics, Inc.*, 439 F.2d 1369, 1374 (5th Cir.), *cert. denied*, 400 U.S. 956, 91 S.Ct. 353, 27 L.Ed.2d 264 (1970); *Neff Instrument Corp. v. Cohu Electronics, Inc.*, 298 F.2d 82, 86 (9th Cir. 1961). The presumption is not conclusive and can be rebutted by proof that the PTO erred. That a reference was cited or assumedly considered does not preclude a court or jury from being convinced that the patent should have been refused in view of that reference. That is not to say, however, that the presumption of validity is limited to those references actually cited by the examiner.

The PTO's function entails a thorough scrutiny of prior art references.[31] The PTO Rules of Practice require the examiner to cite only what he considers the "best references."[32] The "file wrapper," *i.e.*, the

**30.** 35 U.S.C. § 282 provides, in relevant part:
§ 282. Presumption of validity; defenses
A patent shall be presumed valid. Each claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim. The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity.

Under 35 U.S.C. § 282, a patent is presumed valid and the burden of establishing invalidity rests on the party asserting it. *Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313, 335, 91 S.Ct. 1434, 1446, 28 L.Ed.2d 788 (1971); *Woodstream Corp. v. Herter's, Inc., supra* at 1149. The mandate of section 282 is twofold, requiring "that a party asserting invalidity bear not only the presumption-generated burden of going forward with proof but also the burden of persuasion on that issue." *Solder Removal Co. v. International Trade Commission*, 582 F.2d 628, 632 n.8, 65 CCPA 120, 126 n.8 (1978). The latter burden remains upon the party asserting invalidity whether relevant prior art was or was not considered by the examiner during prosecution of the patent application before the PTO. *Solder Removal Co. v. International Trade Commission, id.* at 632–33, 65 CCPA at 125–27; *Woodstream Corp. v. Herter's, Inc., supra* at 1156; *see Champion Spark Plug Co. v. The Gyromat Corp.*, 603 F.2d 361, 366–67 (2d Cir. 1979). The presumption is fully rebutted only when the party asserting invalidity meets the burden of persuasion, *i. e.*, relies on evidence that does in truth render the claimed invention invalid, though rebuttal may be easier when the prior

art relied on is more relevant than that considered by the examiner. *Solder Removal Co. v. International Trade Commission, supra* at 632–33, *Woodstream Corp. v. Herter's Inc., supra* at 1156.

**31.** 35 U.S.C. § 131 (1976) provides:
§ 131. Examination of application
The Commissioner shall cause an examination to be made of the application and the alleged new invention; and if on such examination it appears that the applicant is entitled to a patent under the law, the Commissioner shall issue a patent therefor.
37 C.F.R. § 1.104(a) (1978) provides:
§ 1.104. Nature of examination; examiner's action.
(a) On taking up an application for examination, the examiner shall make a thorough study thereof and shall make a thorough investigation of the available prior art relating to the subject matter of the invention sought to be patented. The examination shall be complete with respect both to compliance of the application with the statutes and rules and to the patentability of the invention as claimed, as well as with respect to matters of form, unless otherwise indicated.

**32.** 37 C.F.R. § 1.106(b) (1978) provides:
§ 1.106. Rejection of claims.
. . . .
(b) In rejecting claims for want of novelty or for obviousness, the examiner must cite the best references at his command. When a reference is complex or shows or describes inventions other than that claimed by the applicant, the particular part relied on must be designated as nearly as practicable. The

prosecution history, of a patent application lists the references cited against the application and the classes and subclasses of references inspected by the examiner.[33] Several courts have held that the examiner's search record is prima facie evidence that he considered all the references classified in the classes and subclasses searched and that he left uncited those he regarded as less relevant than those cited. *Panduit Corp. v. Burndy Corp.*, 517 F.2d 535, 538 n.2 (7th Cir.), *cert. denied*, 423 U.S. 987, 96 S.Ct. 395, 46 L.Ed.2d 304 (1975); *Elgen Manufacturing Corp. v. Grant Wilson, Inc.*, 285 F.2d 476, 479 (7th Cir. 1961); *Farmhand, Inc. v. Lahman Manufacturing Co.*, supra at 760. A contrary view would destroy the presumption of administrative regularity on which the presumption of validity rests.

■ Assuming, *arguendo*, that Berkley's expert is correct in his generalized assertion at trial that references may occasionally be missing from the files, Congress, in enacting the presumption of validity, chose to assume *prima facie* that an oversight of relevant prior art did not occur. In view of the hundreds of patents in a single class or subclass, a requirement that the examiner cite every patent inspected would unreasonably retard the examination process. Thus, absent contrary evidence, it is improper to conclude that references not specifically cit-

ed by the examiner, but classified in areas he searched, were not considered by him. *Cf. Hobbs v. United States,* 451 F.2d 849, 863–64 (5th Cir. 1971).

■ The trial court's instruction that the "presumption does not extend or exist as to prior art patents or publications which do not appear from the record of the file wrapper," and the refusal to give DuPont's requested instruction, left the jury unapprised of the full extent of the statutory presumption of validity.[34]

## II. *Fraud and Antitrust*

The crux of Berkley's antitrust counterclaim was that DuPont knew, or in the exercise of due care should have known, of information that rendered its invention unpatentable but chose to fraudulently conceal that information from the examiner during prosecution of its patent application and further chose to ignore even more such information and enforce the patent, all in a scheme to maintain a monopoly in the fluorescent monofilament fishing line market in violation of Section 2 of the Sherman Act.[35]

Because the jury returned its verdict for DuPont on Berkley's allegations of fraud and patent enforcement, the trial court immediately dismissed the counterclaim, finding the second part of the trial unnecessary.

---

pertinence of each reference, if not apparent, must be clearly explained and each rejected claim specified.

M.P.E.P. § 707.05 (1978) provides in relevant part:

707.05 Citation of References
During the examination of an application the examiner should cite appropriate prior art which is nearest to the subject matter defined in the claims. When such prior art is cited, its pertinence should be explained.

**33.** M.P.E.P. § 904.01(d) (1978) provides, in relevant part:

904.01(d) Outlining Field of Search

. . . .

An examiner, in each first action upon an application, makes an initialed endorsement in ink in the space provided on the left-hand page of the open file wrapper, stating the classes and subclasses of domestic and foreign patents, abstract collections and the publications in which search for references was made and also the date of the search.

**34.** Though instructions must be considered in their entirety, the court's reference to patents that "had not been considered . . . if they are more pertinent than those considered," as part of a single sentence with the statement quoted in the text, could not cure the potential for misdirection of the jury.

**35.** Section 2 of the Sherman Act, 15 U.S.C. § 2 (1976), provides:

§ 2. Monopolizing trade a felony; penalty
Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding one million dollars if a corporation, or, if any other person, one hundred thousand dollars, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.

On appeal, Berkley asks us to adopt its version of parts of the evidence. Having found the jury's verdict fully supported by the weight of all the evidence, and Berkley's versions unfounded, we decline that invitation. Berkley also charges the commission of errors allegedly necessitating reversal of the verdict or a new trial. We treat each issue, setting out the facts as they pertain to each.[36]

### A. Gross Negligence [37]

Accusing DuPont of "gross negligence" in its investigation of facts allegedly placing it on notice that one or more claims of its patent might be invalid, Berkley charges error in the trial court's refusal to instruct and submit to the jury an interrogatory respecting DuPont's gross negligence prior to issuance and enforcement of its patent. The accusation rests on DuPont's conduct respecting the McCoy line, the Starlite line, and reports on underwater visibility of DuPont's fluorescent line product.

In 1964, two years after its patent issued, when DuPont learned of McCoy's Glo-Line product, its investigation of the McCoy story was immediate and thorough. Resulting information concerning the nature and timing of McCoy's use of fluorescent dye was decidedly vague and indefinite. McCoy's statements were inconsistent. No physical or documentary evidence establishing McCoy as a prior user of fluorescent monofilament fishing line ever appeared.[38] Every statement of McCoy about his chartreuse fishing line placed his first use after Keller's invention. McCoy's decision, made after the patent issued, to abandon his fluorescent line was inconsistent with his claim of prior use, notwithstanding his desire to be "friends" with DuPont and Berkley's inference that he must have been "pressured." Keller concluded that "McCoy was just another person who was claiming

**36.** The jury's findings on fraud and enforcement being supported by the evidence, we need not discuss the conflicting interpretations, charges of factual misstatements, and the requested inferences of intent, with which the parties have presented to us the absent (later delivered) attorneys' opinion in exhibit D–7 and the Payne presentation of the Johnson report.

**37.** Because the evidence could not support a finding of gross negligence, we need not and do not decide whether gross negligence may be adequate basis for a charge of antitrust violation. The cases cited by Berkley thrust in a contrary direction or conflict with this court's view as expressed in *Agrashell, Inc. v. Hammons Products Company*, 479 F.2d 269, 287 (8th Cir. 1973). In a post-argument submission, Berkley cites *W. R. Grace & Co. v. Western U. S. Industries, Inc.*, 608 F.2d 1214 (9th Cir. 1979), but that case involved fraud, and the court held the corporation liable, against its employee's denial of actual knowledge of falsity in his representation to the PTO. It is sufficient here that we agree with the trial court, in its ruling on post trial motions, that there was simply no basis in the "evidence in this case" for submitting to the jury any issue of DuPont's failure to inquire into validity of its patent.

DuPont says Berkley did not plead gross negligence. But Berkley pled "fraudulent maintenance," and ambiguous pleadings are to be construed liberally in favor of the pleader. *Hanson v. Hunt Oil Co.*, 398 F.2d 578, 581 (8th Cir. 1968). Berkley cites dicta in *Norton v. Curtiss*, 433 F.2d 779, 794–96, 57 CCPA 1384, 1404–06 (1970), indicating that a patent application may be struck by the PTO if a misrepresentation is made to it with knowledge of falsity or in an "atmosphere" of gross negligence as to truth.

**38.** Paul Johnson of Berkley visited McCoy in December of 1975 and gave the following testimony at trial about his visit:

We asked if he had any invoices or sales records, and he said that he didn't have them anymore; that, after duPont people visited him [in September of 1975], they threw them all out. They didn't exist.

At his deposition, taken by DuPont in July of 1977, McCoy, who was 79 by then, produced his invoices for the years 1954–1958 and after 1964. He no longer had invoices for the years 1959–1963. McCoy's explanation for the missing 1959–1963 invoices was:

Mr. Churchill [counsel for DuPont]: What I am getting at, Mr. McCoy, is that some of these records for these years are missing.

Mr. McCoy: Oh, yes.

Mr. Churchill: What happened to them, can you tell us?

Mr. McCoy: I don't know. I don't know what happened to them.

Mr. Churchill: Were they destroyed in some way?

Mr. McCoy: They may have been. They could have been.

DuPont asserts that those same 1959–1963 invoices were missing when its representatives visited McCoy in September of 1975.

to have had a fluorescent fishing line prior to my invention, and yet had no evidence to back it up." In September, 1975, McCoy gave DuPont's representatives a December, 1964, invoice and a signed statement that it represented one of his first sales of fluorescent line.

 Under all the circumstances, DuPont was not guilty of gross negligence in concluding that McCoy's original vague and inconsistent implication of a prior use was groundless. To require patentees to do more than was here done, when faced with such unsubstantiated allegations, would put them at the mercy of every crank and charlatan who suddenly "remembers" a prior use of the patentee's invention after the patent is issued.

In 1962, Sunset, the company manufacturing Starlite line, was a sales agent for DuPont fishing line. When DuPont's patent issued, a copy went to all sales agents. Sunset received its copy on December 14, 1962, and on December 18, its president Agnew wrote DuPont:

> For your information we put illuminous powders in plastic four or five years ago and when we shine a black light on them, they actually made the line look like it was completely purple.

On January 4, 1963, Tyner of DuPont thought the Starlite line might affect validity of the DuPont patent. Consequently, in early 1963, Keller was sent to investigate Agnew's assertion. Agnew said the Starlite line was a phosphorescent fly line, charged up with a flashlight and used at night, to glow continuously for 10 or 15 minutes after the light was removed, above and under water.

 Though DuPont might have tested the Starlite line for the presence or absence of fluorescent dye,[39] its investigation was more than sufficient to avoid a charge of gross negligence. It promptly investigated Agnew's assertion and could not be held grossly negligent for relying upon what Agnew told and showed Keller. Berkley's expert Stearns admitted that one looking at the Starlite line would be unable to distinguish any fluorescence in it from the phosphorescence. Keller's conclusion that Agnew's phosphorescent fly line had no relevance to DuPont's fluorescent fishing line was not grossly negligent.

 At DuPont's direction, Dr. Johnson had completed his tests and a report on underwater visibility of DuPont's fluorescent line on March 14, 1962, several months before issuance of the DuPont patent. Johnson tested the line under a wide variety of conditions and concluded that it worked as described in the patent application and was useful. Berkley's expert Stearns said Johnson had prepared "a very good scientific reliability report" of which "any scientific lab would be proud," and that Dr. Johnson's tests were all that was necessary to determine how the fishing line would work.[40]

 The report's suggestion that visibility of the line bore an inverse relationship to clarity of the water does not contradict or otherwise invalidate Johnson's conclusion. Nor was his conclusion contradicted by reports of Roberts and Lau to DuPont before suit. Roberts said only that the line did not completely disappear underwater and Lau's statement was based solely on observations made in crystal clear water and thus was not inconsistent with Johnson's report. Johnson's conclusions were corroborated by McNally, a scuba diver hired by DuPont to make underwater observations of its line.

---

**39.** No such test was ever reported by either party. Stearns testified that he found fluorescence in *ex parte* laboratory tests but did not identify the source of that fluorescence.

Agnew and Keller dispute the fact of a 1962 conversation. If it occurred, DuPont's failure to act on it did not constitute gross negligence.

**40.** Stearns also said the report proved Keller's invention "did not work" because it showed the line was not invisible against a dark background or the sky. As discussed *supra* invisibility was not required for utility. Moreover, that Berkley's expert took a particular view of the Johnson report at trial does not establish gross negligence in failure of DuPont to take the same view before or after trial.

In view of the extensive testing by Du-Pont, its tests having confirmed the presence of patentable utility, it cannot be said that DuPont was grossly negligent in determining whether its invention worked.

Citing no specific conduct by DuPont, Berkley adds this vague allegation:

No one knows which pieces of prior art formed the basis for the jury's determination of invalidity. However, it is very possible that the jury determined that the Keller patent was invalid on the basis of prior art which was admittedly known to duPont prior to the issuance or enforcement of the patent. If the jury concluded, on the basis of such facts, that the Keller patent was invalid, the jury may very well have concluded that duPont was grossly negligent in failing to make a similar determination prior to the issuance or enforcement of the patent.

The notion that DuPont could be found guilty of gross negligence for failure to anticipate a jury's verdict is meritless. Moreover, the jury's verdict may have rested on non-utility, with no basis in the prior art. None of the prior art or other information known to DuPont, in any event, so plainly rendered its invention unpatentable that DuPont could be held guilty of gross negligence in accepting its patent and exercising its right to seek legal enforcement in the courts.

 There being no evidence warranting submission of a gross negligence issue to the jury, the trial court committed no error in refusing to give Berkley's requested instruction and interrogatory.

### B. *Jury Instructions on Withholding the Johnson Report*

Focusing exclusively upon one paragraph of an 8 paragraph instruction (No. 21),

Berkley maintains that the court erroneously permitted the jury to find fraud only if DuPont willfully withheld "prior art" from the PTO. The challenged paragraph describes Berkley's burden of proof and speaks only of withholding "prior art." Thus, says Berkley, if the jury found that DuPont withheld scientific data, *i. e.*, the Johnson report, but had not withheld "prior art," it could have erred in finding DuPont not guilty of fraud.

 Jury instructions must be viewed in their entireties and verdicts will not be overturned by picking and choosing words from an instruction without regard to the realities of the trial. *Fields v. Chicago Rock Island and Pacific Railroad*, 532 F.2d 1211, 1213–14 (8th Cir. 1976); *Jiffy Markets, Inc. v. Vogel*, 340 F.2d 495, 500 (8th Cir. 1965).

 Instruction No. 21, read as a whole, emphasizes the requirement for "[a]bsolute honesty and good faith disclosure," the prohibition of "suppression of pertinent facts," and the "rule of absolute candor with the Patent Office." It states that an "omission of material facts" may constitute "fraud" rendering a "patent invalid even if the fraud pertains to only one claim." Thus the instruction as a whole clearly conveys the concept that the withholding of any relevant material, described in the instruction as "prior art," "facts," and "information," may form the basis for a finding of fraud. Berkley at trial stressed the withholding of the Johnson report. There was no real possibility that the jury was misled into believing that it could not consider the withholding of the Johnson report in reaching its decision on fraud.[41]

41. Berkley's primary position on fraud is that, because the Johnson report showed DuPont's line more visible than non-fluorescent line under some water conditions, it would have rendered DuPont's patent invalid for lack of utility and its withholding thus constituted fraud. As indicated in the text, *supra*, the Johnson report would not have demonstrated absence of utility. Nor does the file wrapper indicate that the PTO issued the patent in the belief that the addition of fluorescent dye rendered the line totally invisible or less visible than another line at all depths and in all conditions of water. Nonetheless, the jury's no-fraud finding may have been based on a conclusion that, though Keller's invention was shown at trial as lacking in utility, DuPont was not chargeable with knowing and concealing that fact.

Berkley asserts that DuPont failed to disclose to the PTO its dye booklet and its experiments with dye in nylon powders. We are not told, nor do we see, how those matters are more

## C. *Interrogatories 2 and 3* [42]

Berkley contends that the court erred in phrasing Special Interrogatory 2 as "Did plaintiff obtain the . . . [DuPont] patent·from the patent office by fraud?," and Special Interrogatory 3 as "Did plaintiff assert its patent against Berkley knowing that it was invalid?"

Berkley sought interrogatories asking whether DuPont had obtained by fraud or enforced, knowing to be invalid, "any one or more claims," arguing that fraudulent conduct respecting one claim renders the entire patent invalid, and that enforcement of one claim knowing it to be invalid renders the patentee liable under the antitrust laws even if the remaining claims asserted are valid. [43]

■■ The submission and form of interrogatories to the jury are matters within the sound discretion of the trial court, and review is confined to a determination of whether there was an abuse of discretion. *Tights, Inc. v. Acme-McCrary Corp.*, 541 F.2d 1047, 1060 (4th Cir.), *cert. denied*, 429 U.S. 980, 97 S.Ct. 493, 50 L.Ed.2d 589 (1976); *Dreiling v. General Electric Co.*, 511 F.2d 768, 774 (5th Cir. 1975); *McDonnell v. Timmerman*, 269 F.2d 54, 58 (8th Cir. 1959).

Jury Instruction No. 21 included:

[A] fraud has been perpetrated on the Patent Office and the patent is rendered invalid even if the fraud pertains to only one claim.

■■ Being so instructed, the jury, in giving its "no" answer to Interrogatory No. 2, had before it the concept that DuPont had to have procured every claim of its patent free of fraud. The contested issue having thus been adequately presented to the jury, it cannot be said that the court abused its discretion in phrasing Interrogatory 2. [44]

Concerning Interrogatory No. 3, Berkley speculates that:

The evidence in this case disclosed test results and numerous pieces of prior art, of which duPont had knowledge, that *may* have invalidated one or more, but not all, of the claims of the Keller patent.

. . .

· · · ·

. . . [A] careful examination of each piece of prior art and each test result introduced into evidence at trial *could arguably* have been construed by the jury to invalidate one or more claims of the Keller patent, without invalidating all of the claims of the patent. Additionally, a jury *could have* concluded that even though a piece of prior art invalidated all of the claims of the Keller patent, duPont's actual knowledge was such that duPont was only aware that certain claims of said patent were invalid when it decided to file suit against Berkley. [Emphasis added.]

pertinent than the 16 items disclosed by DuPont to the PTO and the 8 patents cited by the examiner.

**42.** In its Statement of the Issues Presented for Review, Berkley did not request review of the jury's answer to Interrogatories 2 and 3. Nor did it argue that issue. In the conclusion of its initial brief, however, Berkley alleged broadly that the answers were "contrary to the great weight of the evidence." When DuPont asserted waiver of the issue, Berkley reiterated the same broad attack, adding that it "has not abandoned the issue" and that "its entire brief deals with the issue." Berkley's briefs reveal little more than catalog descriptions of information allegedly known to DuPont, followed by broad assertions that the examiner was never advised of the information. No direct evidence that DuPont acted in bad faith is cited. It is unnecessary to decide whether Berkley waived the issue. The evidence adduced at trial was

more than ample to support the jury's answers to Interrogatories 2 and 3.

**43.** DuPont disputes Berkley's premise. However, we need not and do not decide in this case the issues of whether fraud in obtaining one claim renders the entire patent invalid or whether enforcement of a patent having claims valid and claims known to be invalid renders a patentee liable under the antitrust laws.

**44.** Berkley's briefs argue error in refusal of the requested interrogatory, ignoring the effect of Instruction 21. At trial, however, Berkley recognized that juries are presumed to answer interrogatories in the light of instructions, when it successfully objected to inclusion in Interrogatory 2 of the fraud burden on the ground that the burden was already described in Instruction 21.

██ Berkley was ultimately charged with infringement of only claims 2, 5, and 6. It has offered not even speculation as to how the jury might have concluded that DuPont enforced one or two but not all three of those claims believing them to be invalid. Though DuPont initially asserted claims 1 and 8, there is no evidence from which a jury could find that DuPont "knew" those claims were invalid when it filed its complaint. Because no charge of enforcement of any claim believing it to be invalid could properly lie, the interrogatory sought by Berkley could only have been prejudicial to DuPont. Hence, no abuse of discretion occurred in the phrasing of Interrogatory 3.

### D. Exclusion of "Intent" Evidence

Berkley contends that the court erred in excluding evidence allegedly demonstrating that DuPont enforced its patent with intent to destroy competition.

 A trial judge can and should exclude evidence when convinced that it will create a danger of prejudice outweighing its probative value.[45] The judge has wide discretion in ruling on the admissibility of evidence and his decisions thereon will not be disturbed unless there be a clear and prejudicial abuse of discretion. *Wright v. Hartford Accident & Indemnity Co.*, 580 F.2d 809, 810 (5th Cir. 1978); *Rigby v. Beech Aircraft Co.*, 548 F.2d 288, 293 (10th Cir. 1977); *Kilarjian v. Horvath*, 379 F.2d 547, 548 (2d Cir. 1967); *Great American Insurance Co. v. Horab*, 309 F.2d 262, 265 (8th Cir. 1962).

Berkley offered the deposition of Hilberg, a DuPont patent attorney, to prove that DuPont asserted its patent against Scientif-ic Anglers, a company that had been conducting fluorescent fly line demonstrations, thus admitting that its patent encompassed the prior art fly lines of Olson and Wood and was therefore invalid.[46]

Hilberg's deposition was decidedly imprecise, uncertain, and seriously lacking in probative value. The two Hilberg sentences quoted by Berkley were contradicted by DuPont, which consistently maintained that it never asserted its patent against Scientif-ic Anglers, and by Scientific Anglers itself when it told Berkley that DuPont had never asserted the patent against it.

██ The trial court excluded Hilberg's deposition, correctly finding it "shakey at best, its probity and relevance dubious, and potential for prejudicing DuPont's case substantial." No abuse of discretion occurred in that exclusion.[47]

Berkley offered three exhibits from the deposition of Harry Haon, a DuPont employee. D–7 was a pre-suit Haon memorandum stating that Berkley was infringing, comparing the potential loss from that infringement with the cost of litigation, recommending that a legal opinion be obtained on enforceability of the patent, and, if that opinion be favorable, that suit be filed before Berkley introduced its line at a trade show and became entrenched in its infringement. E–7 was a draft of a letter to the DuPont Executive Committee, about the proposal to sue Berkley, estimating the loss from infringement, referring to a legal opinion, and viewing the cost of suit, if lost, as justified by its impact on Berkley. F–7 was a DuPont press release announcing the suit against Berkley.

The exhibits contain no indication that DuPont believed its patent was invalid.

---

**45.** Fed.R.Evid. 403 provides:

> Rule 403. Exclusion of Relevant Evidence on Grounds of Prejudice, Confusion, or Waste of Time
>
> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

**46.** The examiner allowed DuPont's claims only after they were amended to limit them to fishing line.

**47.** Berkley's briefs do not mention Scientific Anglers' denial that DuPont asserted the patent against it, nor do those briefs mention, quote, dispute, or counter the trial court's evaluation of the Hilberg deposition.

Recognition that an infringement suit may not succeed simply reflects a realistic awareness of the historically low percentage of patents held valid in litigation. The potential for jury misconstruction of the Haon exhibits, which the trial court correctly described as reflecting "the internal consideration of cost versus bringing suit, which is a legitimate consideration for any patentee to engage in," would have been unacceptably prejudicial.[48]

■ By definition, every good faith effort to enforce a patent involves a legitimate anticompetitive intent.[49] The Haon exhibits indicate DuPont's consideration and recognition that a suit enforcing its patent might have adverse effects on Berkley's sales of its infringing line. There is, however, no legal obligation of patentees to withhold suit until an infringer is well along in its infringement. In all events, consideration of DuPont's anticompetitive intent is premature, absent threshold evidence that DuPont believed its patent was invalid.[50] The trial court, recognizing that distinction, correctly cited it as an additional reason for excluding the Haon exhibits:

. . . One reason for bifurcation was to avoid the effect of evidence relevant to one issue spilling over and coloring evidence in the other portion of the case. The Haon evidence was just such evidence.

■ The trial court did not abuse its discretion in excluding the Haon evidence under Fed.R.Evid. 403, on the ground that it was "prejudicial" and "not sufficiently probative."

### E. Inequitable Conduct

Defining "inequitable conduct" as an intentional misrepresentation or non-disclosure to the PTO[51] that, although material, did not cause issuance of the patent, and "fraud" on the PTO as a misrepresentation or nondisclosure, absent which the patent would not have issued, Berkley requested an interrogatory on inequitable conduct, the jury's affirmative answer to be used as a basis for proceeding with proof of other elements of an antitrust violation. Berkley also requested an instruction that the jury could find the DuPont patent "unenforceable" if DuPont were guilty of "inequitable conduct" before the PTO. The trial court denied both requests.

■ Berkley's attempt to base its antitrust counterclaim on "inequitable conduct" has no basis in law.[52] In *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 174, 86 S.Ct. 347, 348, 15 L.Ed.2d 247 (1965), the Supreme Court ruled that enforcement of a patent procured by fraud on the PTO may violate § 2 of the Sherman Act if other elements necessary to a § 2 case are present. Admitting that *Walker Process* and its progeny speak only of fraud, and acknowledging that no court has recognized "inequitable conduct" as a basis for an action under Section 2 of the Sherman Act, Berkley

---

**48.** The trial court correctly characterized the Haon exhibit matter as "a waste of time."

**49.** If the patent be valid, the competition involves a product which by definition did not exist before the inventor contributed it to the marketplace. Enforcement of the patent in that case takes nothing from the public, and nothing from the infringer to which it had any right.

**50.** Citing no authority, and for the first time on appeal, Berkley argues that enforcement with anticompetitive intent alone, even if DuPont had no actual knowledge of invalidity and was not guilty of gross negligence in failing to determine invalidity, would support an antitrust claim. The argument is meritless.

**51.** Berkley makes no charge of specific misrepresentation, but lists seven items DuPont did not disclose to the PTO.

**52.** Berkley concedes an absence of authority, but says courts have been "equivocal" and have "indicated that logic might dictate" its position, citing only *Corning Glass Works v. Anchor Hocking Glass Corp.*, 253 F.Supp. 461, 470 n.23 (D.Del.1966), aff'd in part, rev'd in part on other grounds, 374 F.2d 473 (3d Cir.), cert. denied, 389 U.S. 826, 88 S.Ct. 65, 19 L.Ed.2d 80 (1967). In that case, however, the court distinguished fraud from inequitable conduct and, referring to inequitable conduct statements, said ". . . there is no illegal monopoly resulting from the statements on which to base an anti-trust action."

nevertheless argues that it is as much a violation of the Act "for a patent owner to enforce an 'unenforceable' patent against potential competitors as it is to enforce an 'invalid' patent." We disagree.

■ A patent procured by fraud by definition would not have issued but for the misrepresentation or non-disclosure. The patent is invalid as improperly issued and the patentee has illegally received exclusionary rights he would not otherwise have. In those circumstances, as the Supreme Court held in *Walker Process*, the severe sanctions of the Sherman Act may be warranted.

■ However, where the patent was not procured through non-disclosure, the patent would properly issue and the patentee would receive no exclusionary rights to which he was not legally entitled under the patent laws. Hence, no basis exists for a charge of illegal monopolization or attempt to monopolize. Refusal to enforce the patent has been considered adequate sanction. *Mueller Brass Co. v. Reading Industries, Inc.*, 352 F.Supp. 1357, 1371 (E.D.Pa.1972), *aff'd*, 487 F.2d 1395 (3d Cir. 1973); *SCM Corp. v. Radio Corporation of America*, 318 F.Supp. 433, 472 (S.D.N.Y.1970); *Corning Glass Works v. Anchor Hocking Glass Corp.*, *supra* note 52, at 470.

■ Berkley further argues, citing no authority, that if inequitable conduct standing alone is an insufficient basis for an antitrust cause of action, it is such a basis when combined with an anticompetitive intent in bringing suit on the patent. We disagree. Berkley cites excluded exhibits D–7, E–7, and F–7. But those exhibits focus exclusively on events occurring *after* issuance of the patent. They bear no relation to DuPont's conduct before the PTO and, if they had been admissible, they could not bootstrap that non-fraudulent conduct, not otherwise actionable under the antitrust

laws, into the more egregious *Walker Process* type conduct.

■ The trial court gave no reasons for denying Berkley's requested instruction on inequitable conduct as a defense of non-enforceability.[53] Absent a ruling that the evidence was insufficient, or more prejudicial than probative, an instruction on that question would be proper.

■ DuPont's contention that Berkley never pled an inequitable conduct defense is without merit. Berkley's inequitable conduct theory differs from its expressly pled allegation of fraud only in the degree of materiality of the information allegedly withheld from the PTO. The pleadings placed DuPont on notice of the type of conduct that would be litigated, and that is all that is required. *See Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).

■ This circuit has recognized that inequitable conduct short of fraud can be a defense in a patent infringement suit. *Pfizer, Inc. v. International Rectifier Corp.*, 538 F.2d 180, 185 (8th Cir. 1976), *cert. denied*, 429 U.S. 1040, 97 S.Ct. 738, 50 L.Ed.2d 751 (1977). To make out a case of inequitable conduct Berkley must prove, by "clear, unequivocal and convincing evidence," *Pfizer, Inc. v. International Rectifier Corp.*, *id.* at 187, that DuPont's conduct made it impossible for the PTO to fairly assess the patent application against the prevailing statutory criteria, *In re Multidistrict Litigation Involving Frost Patent*, 540 F.2d 601, 604 n. 9 (3d Cir. 1976), and that it involved "some element of wrongfulness, willfulness or bad faith." *Pfizer, Inc. v. International Rectifier Corp.*, *supra* at 186. If the information be irrelevant, its innocent or negligent misrepresentation or non-disclosure, whether or not intentional, does not amount to inequitable conduct. *Pfizer, Inc. v. International Rectifier Corp.*, *supra*, at 186;

---

**53.** In denying Berkley's motion for a new trial (*i. e.*, a trial of its antitrust claim) on inequitable conduct, the trial court stated:

Although inequitable conduct is a viable theory in patent law, it had no place in this case as it was never pleaded and even if pleaded would only have gone to the enforcement of the patent and not to the antitrust issues. The jury held the patent unenforceable.

*Corning Glass Works v. Anchor Hocking Glass Corp., supra* note 52, at 471 n. 27.

A strong caveat was raised by this court in *Pfizer, Inc. v. International Rectifier Corp., supra* at 196:

> An infringement defendant in complex litigation should not be permitted to side-step these main issues by nit-picking the patent file in every minute respect with the effect of trying the patentee personally, rather than the patent. A patentee's oversights are easily magnified out of proportion by one accused of infringement seeking to escape the reach of the patent by hostilely combing the inventor's files in liberal pretrial discovery proceedings. Unjustified damage to professional and social reputations can result, as here, without fostering any corresponding public benefit in the form of inhibiting future improvident grants of patent monopolies.

 Thus Berkley may face a heavy burden in establishing inequitable conduct on the evidence concerning *non-disclosures* to the PTO. Nonetheless, absent the trial court's determination that that evidence was legally inadequate, or more prejudicial than probative, Berkley had a right to jury determination of whether the information not disclosed was sufficiently relevant to meet the inequitable conduct standard of materiality but not sufficiently relevant to meet the fraud standard of materiality.[54] No useful purpose would be served by a review of that evidence here.[55] If the inequitable conduct defense be renewed at re-trial, the trial court, with the above guidance, will determine in its discretion the admissibility of evidence presented. It is sufficient on this appeal to hold that the trial court erred in refusing, without explanation, to instruct the jury on the defense of inequitable conduct. Berkley may renew this defense against enforcement at retrial.

## F. Dismissal of the Antitrust Counterclaim

Berkley says it didn't get its day in court on its counterclaim. We disagree.

Berkley sought to prove two species of antitrust violation, one based on fraudulent conduct before the PTO, the other based on bringing suit with knowledge that the patent was invalid. Proof of one of those threshold allegations was essential to Berkley's antitrust cause of action.

The court gave Berkley a full and fair trial on both threshold questions and submitted them specially to the jury in Interrogatories 2 and 3.[56] When the jury answered "no" to both, establishing that Du-Pont did not obtain the patent by fraud and did not enforce the patent knowing it to be invalid, Berkley's antitrust counterclaim was necessarily stripped of all foundation and support.

As indicated *supra*, Berkley's allegations of gross negligence were unsupported by the evidence. Its allegations of inequitable conduct and anticompetitive intent will not support its antitrust counterclaim.

> DuPont does not specifically argue absence of error in refusing an instruction on enforceability. It says the only question to which inequitable conduct may relate is Berkley's demand for attorneys' fees, denied by the trial court because DuPont's acts in pursuing and asserting its patent were not so "reckless or fraudulent" as to make this an exceptional case. But that is a different question from whether Berkley had a right to have its nondisclosure evidence go to the jury.

---

**54.** The jury asked the court whether a finding of fraud would "open the door for a fraud case" against DuPont. The court correctly answered that the jury should ignore consequences of its findings.

**55.** Except, perhaps, to mention that evidence submitted to show non-utility has no place at retrial.

DuPont argues the evidence was not probative of inequitable conduct, because the information not disclosed was irrelevant or less relevant than that which was disclosed, and points to an absence of evidence of bad faith. These are matters, however, for the trial court in the first instance, or, if the evidence be admitted, for a jury following proper instructions.

**56.** Berkley's brief is thus mistaken in stating "the jury heard the patent infringement case but never reached the antitrust issues." The jury reached and decided the bedrock antitrust issues.

Berkley having had its day in court, the trial court properly dismissed its antitrust counterclaim.

### Summary

The jury having been presented with substantial evidence on utility, that issue having been one of the predominant matters litigated, it is probable if not certain that the jury based its verdict for Berkley on a belief that DuPont's invention lacked utility. Consequently, the error of submitting the utility issue to the jury was so highly prejudicial to DuPont as to warrant a new trial on the issue of patent validity.

The error in submitting to the jury the lack-of-novelty defense based on the McCoy line, that issue having also received extensive treatment at trial, would, standing alone, warrant a new trial on patent validity.

The combination of the utility and McCoy line prejudicial errors renders the need for a new trial compelling on patent validity.[57]

The lack-of-novelty defense based on the Cohantic Line, and the obviousness defense, present proper jury questions. On retrial, the court need litigate only those issues respecting the validity of the DuPont patent.

The trial court committed no reversible error in (1) refusing an instruction and interrogatory on gross negligence; (2) instructing on fraud; (3) phrasing Interrogatories 2 and 3; (4) excluding the Hilberg deposition and Haon exhibits; (5) refusing an instruction on inequitable conduct as a

basis for an antitrust violation; and (6) dismissing the antitrust counterclaim.

The jury's findings that DuPont did not obtain the patent by fraud and did not enforce the patent knowing it to be invalid were supported by the evidence.

The trial court erred in refusing to instruct the jury on inequitable conduct as a defense of unenforceability to DuPont's patent infringement suit.

### CONCLUSION

The dismissal of Berkley's antitrust counterclaim is affirmed.

 The judgment holding the DuPont patent invalid is vacated, and the case is remanded for a new trial on the issues of validity and enforceability of the DuPont patent. Three defenses appear appropriate, namely, that (1) the invention was anticipated by the Cohantic Line; (2) the invention would have been obvious to one skilled in the art at the time it was made; and (3) the patent was rendered unenforceable by DuPont's inequitable conduct before the PTO.[58]

---

57. We need not consider whether the French line and presumption of validity errors were so prejudicial as to independently warrant a new trial on patent validity.

58. Most references to retrial before a jury herein are applicable to retrial before a judge. Though piecemeal litigation is not the norm, consideration might be given to sequential trials under Rule 42(b), Fed.R.Civ.P. If defense (1) is sustained, trial is unnecessary on (2) and (3). If defense (1) fails, but (2) is sustained, (3) is unnecessary. Similarly, a successful defense (3) would render trial of (1) and (2) unnecessary, the validity of a patent expired and unenforceable being moot. The sequence and grouping of issues tried first might turn on the estimated time to try each. Separate appeals are conceivable, but the clear-cut clarity of each might result in a net gain in judicial economy.

The jury did not answer the interrogatories submitted to it on DuPont's damages and Berkley's intentional infringement. Though vigorously argued here, these issues are not ripe for resolution on this appeal. They may be presented at retrial.