T.W. KUTTER, INC., Plaintiff,

v.

KOCH SUPPLIES, INC., and Multivac Sepp Haggenmuller KG, Defendants.

No. 83–0547–CV–W–1.

United States District Court,
W.D. Missouri, W.D.

April 17, 1986.

John M. Collins, Warren N. Williams, Schmidt, Johnson, Hovey & Williams, Kansas City, Mo., for plaintiff.

Carter H. Kokjer, Kokjer, Kircher, Bradley, Wharton, Bowman & Johnson, Kansas City, Mo., for defendants.

## MEMORANDUM OPINION, FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDERS

JOHN W. OLIVER, Senior District Judge.

## I. INTRODUCTION AND APPLICABLE STANDARD OF PROOF

### A.

This patent case presents two questions, both separated for determination pursuant to Rule 42(b) of the Federal Rules of Civil Procedure, in regard to (1) the validity and (2) the alleged infringement of the patent-in-suit.

Exemplary compliance with this Court's pretrial and posttrial directions established a substantial area of undisputed fact. The parties also filed excellent pretrial and post-trial briefs. Those briefs made it apparent before any evidence was adduced

that the question of how the applicable standard of proof should be applied was a disputed question of paramount importance.

Defendants' pretrial brief argued that it would establish by "clear and convincing evidence" that the patent-in-suit was invalid under both Section 102(b) and Section 103.[1] Plaintiff, on the other hand, argued in its pretrial brief that the "defendants bear *an extremely heavy* burden of proof" (emphasis added) for the reason that "defendants rely heavily upon their *own* alleged prior uses of the patented invention, and offer only uncorroborated oral testimony of employees as proof [and that under] these circumstances, the standard is even higher, and approaches 'beyond a reasonable doubt'." (Emphasis in original). Pl. Pretrial Brief at 11.

The question of what standard of proof should be applied was again placed in focus by plaintiff's opening statement on the first day of trial. Plaintiff there made direct reference to *The Barbed Wire Patent*, 143 U.S. 275, 12 S.Ct. 443, 36 L.Ed. 154 (1892), which, of course, could be read to impose a beyond reasonable doubt standard of proof under the circumstances of this case.[2]

It is thus clear that the parties, although in agreement that the clear and convincing standard is applicable to this case, have from the outset of this litigation been in substantial disagreement in regard to how the clear and convincing evidence standard of proof should be defined and applied to the evidence adduced at trial. Is the plaintiff right in describing that standard as imposing an "extremely heavy" burden which at least approaches the beyond reasonable doubt standard stated in *The Barbed Wire Patent* and *Deering v. Winona Harvester Works*, 155 U.S. 286, 301, 15 S.Ct. 118, 123–24, 39 L.Ed. 153 (1894)? Or are the defendants right in proposing that plaintiff's "extremely heavy" descriptive label of the applicable standard be stricken?

Those questions are important questions. For it may fairly be said that this case presents any number of close questions on the facts. I turn now to the standard of proof that will be applied in this case.

### B.

Both parties rely on Chief Judge Markey's opinion for the panel in *E.I. du Pont de Nemours v. Berkley & Co., Inc.* 620 F.2d 1247 (8th Cir.1980). That case concluded that the "burden of proof of a prior use is satisfied only by evidence clear, cogent, and convincing." That case appropriately noted that "[o]ral testimony alone has been held insufficient to prove a prior use," citing *Zachos v. Sherwin-Williams Co.*, 177 F.2d 762, 763 (5th Cir.1949). *Berkley*, 620 F.2d at 1261. However, Chief Judge Markey immediately made clear that the "more widespread view ... is that unsupported oral testimony can be sufficient but must be regarded with suspicion and subjected to close scrutiny." *Id.* at 1261.[3]

Although *Zachos* cited *Smith v. Hall*, 301 U.S. 216, 57 S.Ct. 711, 81 L.Ed. 1049

1. Defendants argued that the oral testimony of its live witnesses and oral testimony of other witnesses adduced by way of deposition and other evidence concerning the sale of the Hans Mueller R–70 machine and its sale of a number of other R–70 machines in Europe would constitute sufficient corroboration of the oral testimony of defendants' witnesses that would, in fact, meet the clear and convincing standard of proof.

2. The burden of proof question was placed in final focus by the parties' post-trial filings. Plaintiff's first proposed conclusion of law stated in part that the defendants "bear an extremely heavy burden of proof" under the applicable clear and convincing standard of proof. Pl. Post-Trial Findings of Fact and Conclusions of Law at 76. Defendants' post-trial cross-fire response proposed that this Court strike the words "extremely heavy" from plaintiff's description of the applicable burden of proof. Deft.'s Post-Trial Cross-Fire Response at 76.

3. *Zachos v. Sherwin-Williams, supra,* the case that Chief Judge Markey noted was inconsistent with the "more widespread view," clearly concluded that the rule established in the early Supreme Court cases required that "proof of prior use must be beyond a reasonable doubt, and that without some authentic documentary support, mere oral evidence adduced to fix the date of the prior use will not suffice." 177 F.2d at 763.

(1937), the Fifth Circuit nevertheless concluded that "we can find no relaxation or modification" of the proof beyond reasonable doubt rule stated in *The Barbed Wire Patent, supra; Deering v. Winona Harvester Works, supra;* and in *Eibel Co. v. Paper Co.,* 261 U.S. 45, 43 S.Ct. 322, 67 L.Ed. 523 (1923).[4]

*Berkley & Co., Inc.,* however, cited *Smith v. Hall, supra,* to support its view of the "more widespread rule" and concluded that the Court in that case had rejected the *Zachos* court's reading of the beyond reasonable doubt standard stated in the early Supreme Court cases. We agree that *Smith v. Hall* did relax and modify the proof beyond doubt standard stated in the earlier Supreme Court cases. *Smith v. Hall* read the earlier Supreme Court cases as only establishing a rule that "oral testimony ... *without corroboration,* ... is insufficient to establish prior use." (Emphasis added). 301 U.S. at 222, 57 S.Ct. at 714. Most importantly, it must be noted that *Smith v. Hall* in affirming a finding of invalidity, concluded on its facts, that contemporary documentary evidence contained in the record, did, in fact, "afford convincing corroboration of the oral testimony that the incubator in use in Brooklyn immediately preceding the filing of the application, ... employed the method of the Smith claim." 301 U.S. 226, 57 S.Ct. at 716.[5]

The recent controlling decisions of the Court of Appeals for the Federal Circuit have abandoned the use of all the verbal variances formerly used by various courts to state the applicable standard of proof in favor of the more simply stated "clear and convincing" standard of proof. In its recent decision in *Panduit Corp. v. Dennison Mfg. Co.,* 774 F.2d 1082 (Fed.Cir.1985), the burden of proof standard to be followed by all district courts throughout the federal system was stated as follows:

> The statute mandating a presumption of validity, 35 U.S.C. § 282, places the burden of proving facts compelling a conclusion of invalidity on the party asserting invalidity. This court has said the burden of proving facts compelling a conclusion of patent invalidity must be carried by clear and convincing evidence. *SSIH Equipment, S.A. v. U.S. Intern. Trade Comm'n.,* 718 F.2d 365, 375, 218 USPQ 678, 687 (Fed.Cir.1983). The role of the court is to determine whether the validity challenger carried that burden.

774 F.2d at 1096.

*Panduit Corp.* added that if "the court determines that that burden was not car-

---

**4.** The *Zachos* court emphasized in another part of its opinion that "we have found nothing to indicate that a departure from the rule is, or should be, imminent or probable." That case added that "[o]n the contrary, we believe that the reasons for the rule so well stated by Mr. Justice Brown in the *Barbed Wire* and *Deering* cases and approved and relied on in cases following are still potent and compelling." 177 F.2d at 763.

**5.** *Smith v. Hall* also concluded that the contemporary corroborative circumstances established under the facts of that case constituted "convincing evidence" which could be said to "support the heavy burden of persuasion which rests upon one who seeks to negative novelty in a patent by showing prior use. *See Radio Corporation v. Radio Engineering Laboratories,* 293 U.S. 1, 7 [55 S.Ct. 928, 930, 79 L.Ed. 634 (1934)], and cases cited." 301 U.S. at 233, 57 S.Ct. at 718.

*Radio Corp.,* upon which *Smith v. Hall* relied, used a variety of words to define the standard under which the presumption of validity established by the issuance of a patent could be overcome. That case stated that the presumption may not be overthrown except by *"clear and cogent evidence"* (emphasis added) 293 U.S. at 2, 55 S.Ct. at 929; that a patent regularly issued "is presumed to be valid until the presumption has been overcome *by convincing evidence of error" id.* at 7, 55 S.Ct. at 931 (emphasis added); and that "the presumption of validity shall prevail against strangers as well as parties unless the countervailing evidence is *clear and satisfactory."* (Emphasis added). *Id.* at 9, 55 S.Ct. at 931. *Radio Corp.* observed, however, that the different words that various Courts had used to define the applicable intermediate standard of proof was not significant. For that case pointed out that through "all the verbal variances ... there runs this common core of thought and truth, that one otherwise an infringer who assails the validity of a patent fair upon its face bears *a heavy burden of persuasion,* and fails unless his evidence *has more than a dubious preponderance."* (Emphasis added). *Id.* at 8, 55 S.Ct. at 931.

ried, it need only so state" and that if "the court determines that that burden was carried, it should declare the patent invalid," citing *Lindemann Maschinenfabrick GMBH v. American Hoist & Derrick Co.,* 730 F.2d 1452, 1452 n. 1, 221 USPQ 481, 484 n. 1 (Fed.Cir.1984).[6] *Id.* at 1096.

It is thus clear that the Court of Appeals for the Federal Circuit has eliminated all variances in its statement of the applicable clear and convincing standard of proof. The Federal Circuit's adoption of uniform language as to how the standard should be stated does not, however, fully answer the question of how that standard should be applied by the finder of the facts in a particular case. I turn now to that question.

### C.

As we noted, the parties in this case are in general agreement that this Court must apply the clear and convincing evidence standard to the evidence adduced in this case. The parties do not disagree that such a standard may be said to occupy some point on the spectrum between the preponderance of the evidence standard generally applicable to civil cases and the proof beyond reasonable doubt standard that is constitutionally applicable to criminal cases.

Plaintiff's proposed conclusion of law, however, would have this Court label and define the clear and convincing evidence standard as one which imposes an "extremely heavy burden of proof." Plaintiff's reference to *The Barbed Wire Patent* case and its progeny, suggests that plaintiff believes that the clear and convincing standard should, at the very least, be considered to be much closer to the reasonable doubt standard than the preponderance of the evidence standard. Defendants' argument reflects defendants' opposing view that the clear and convincing standard may not properly be considered to occupy a point as close to the reasonable doubt standard as plaintiff argues.

We agree with the defendants that no descriptive label should be added to the applicable clear and convincing evidence standard of proof. For we do not believe that any fixed point on the spectrum can be stated with precision in regard to where that standard may be said to rest. We are satisfied, however, that the clear and convincing standard is a quite different standard than the two other standards that occupy the respective ends of the spectrum.[7]

---

**6.** *American Hoist & Derrick Co.,* also cited in *Panduit Corp.,* in reliance upon the Supreme Court's opinion in *Radio Corp., supra,* held that "[t]he burden upon the challenger of validity under 35 U.S.C. § 282 is to introduce evidence of facts establishing invalidity (thus overcoming the presumption). *American Hoist & Derrick Company v. Sowa & Sons, Inc.,* 725 F.2d 1350 (Fed.Cir.1984). That evidence, if it is to carry the day, must be *clear and convincing. Radio Corp. v. Radio Laboratories,* 293 U.S. 1, 55 S.Ct. 928, 78 L.Ed. 1453 (1934)." (Emphasis added). 730 F.2d at 1459.

*Sowa & Sons, Inc.* cited in *American Hoist & Derrick Co.,* in its turn relied on *Radio Corp.* to make clear that the factual circumstances of a particular case "has no effect on the [Section 282] presumption or on who has the burden of proof." 725 F.2d at 1360. *Sowa & Sons* added that both the presumption and the burden of proof "are static and in reality different expressions of the same thing—a single hurdle to be cleared" and that neither "does the *standard* of proof change; it must be by clear and convincing evidence or its equivalent, by whatever form

of words it may be expressed. *See Radio Corp., supra."* (Emphasis, the court's). *Id.* at 1360.

**7.** The Supreme Court, in the cases which I will presently discuss, has placed substantial reliance on Justice Harlan's thoughtful concurring opinion in *In re Winship,* 397 U.S. 358, 368–75, 90 S.Ct. 1068, 1074–78, 25 L.Ed.2d 368 (1970). I believe Justice Harlan was close to the mark when he recognized that "the labels used for alternative standards of proof are vague and not a very sure guide to decisionmaking, ...." *Id.* at 369, 90 S.Ct. at 1075. Justice Harlan explained, however, that "a standard of proof represents an attempt to instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication." *Id.* at 370, 90 S.Ct. at 1076. While Justice Harlan's observations suggest that a point on the spectrum may not be fixed with precision for an intermediate standard of proof, they do, I believe, suggest that appropriate recognition must be given to the reasons that support the three separate standards of proof that must be applied in different types of cases.

We turn now to the most recent Supreme Court cases in which the clear and convincing standard of proof was discussed and applied.

### D.

On June 8, 1984, the Supreme Court handed down its second opinion in *Colorado v. New Mexico*, 467 U.S. 310, 104 S.Ct. 2433, 81 L.Ed.2d 247 (1984). In its first opinion, *Colorado v. New Mexico*, 459 U.S. 176, 103 S.Ct. 539, 74 L.Ed.2d 348 (1982), decided two years earlier, the Court sustained exceptions to a special master's report and remanded the case for further proceedings. In *Colorado v. New Mexico II*, the Court stated that when *Colorado v. New Mexico I* was decided in 1982, "the Court made clear that Colorado's proof would be judged by a clear-and-convincing-evidence standard." 467 U.S. at 316, 104 S.Ct. at 2438. The Court added that: "In contrast to the ordinary civil case, which typically is judged by a 'preponderance of the evidence' standard, we thought a diversion of interstate water should be allowed only if Colorado could place in the ultimate factfinder an abiding conviction that the truth of its factual contentions are 'highly probable.' *See* C. McCormick, *Law of Evidence* § 320, p. 679 (1954)." *Id.* at 316, 104 S.Ct. at 2438. *Colorado v. New Mexico II* cited and relied on *Addington v. Texas*, 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979), in which the Court recognized that there are "three standards or levels of proof for different types of cases." [8] *Id.* at 423, 99 S.Ct. at 1808.

*Colorado v. New Mexico II* and *Addington v. Texas* cited and relied upon McCormick, *Law of Evidence* § 320, p. 679 (1954), 9 J. Wigmore, *Evidence* § 2498 (3d ed.

1940), and McBaine, *Burden of Proof: Degrees of Belief,* 32 Calif.L.Rev. 242, 251–54. McCormick's Section 320 is entitled "Satisfying the Burden of Persuasion: (b) Requirement of Clear and Convincing Proof." The first sentence of that section explained that under the clear and convincing standard a party is required to establish his case by a more exacting measure of persuasion than that required under the traditional preponderance of the evidence standard. Wigmore's Section 2498 noted that "a stricter standard, in some such phrase as 'clear and convincing proof,' is commonly applied to measure the necessary persuasion" in a substantial group of cases including cases which "involve the prior anticipatory use of an invention." *Id.* at 430. McBaine stated in his essay that in the group of cases in which the clear and convincing evidence standard of proof is to be applied, "courts have decided, not unwisely, that a litigant who asserts certain facts must carry a greater burden than is required ordinarily in civil suits and lesser burden than the state must carry in a criminal prosecution." *Id.* at 253.

The Court concluded in *Colorado v. New Mexico II* that the findings of the special master in favor of Colorado could not be sustained under the clear and convincing evidence standard. In so holding the Court stated that the clear and convincing standard imposed the burden on Colorado to "place in the ultimate factfinder an abiding conviction that the truth of its factual contentions are 'highly probable'." The "highly probable" phrase was directly quoted from McCormick's Section 320.[9]

We do not believe that the Court's use and quotation of McCormick's "highly

---

**8.** *Addington v. Texas* noted that at "one end of the spectrum is the typical civil case [in which] plaintiff's burden of proof is a mere preponderance of the evidence," *Id.* at 423, 99 S.Ct. at 1808, and that at the other end of the spectrum is the criminal case in which, under the Due Process Clause, "the state prove the guilt of an accused beyond a reasonable doubt." *Id.* at 424, 99 S.Ct. at 1808. In describing the third recognized standard of proof the Court stated that "[t]he intermediate standard, which usually employs some combination of the words 'clear,'

'cogent,' 'unequivocal' and 'convincing,' is less commonly used, but nonetheless 'is no stranger to the civil law.'" *Woodby v. INS,* 385 U.S. 276, 285, 87 S.Ct. 483, 488, 17 L.Ed.2d 362 (1966). *Id.* at 424, 99 S.Ct. at 1808.

**9.** McCormick's Section 320 shows that he used the "highly probable" phrase in his Section 320 in reliance on pages 246, and 253–54 of McBaine's essay in the California Law Review.

probable" phrase may properly be read to support plaintiff's proposed conclusion of law that the clear and convincing evidence standard should be labeled as imposing an "extremely heavy burden" of proof. For we are satisfied that the Court in *Colorado v. New Mexico II*, by its use of the "highly probable" phrase and its citation of McCormick, Wigmore, and McBaine intended to clarify rather than confuse the application of the clear and convincing standard of proof.

Acceptance of plaintiff's suggestion that the clear and convincing standard should be labeled as an "extremely heavy burden of proof" would be consistent with the notion that the proof beyond reasonable doubt standard in *The Barbed Wire Patent* and other early Supreme Court cases was not substantially modified by the Court's more recent decision in *Smith v. Hall*. Plaintiff's suggestion will be rejected in order to make clear that we do not accept that notion.

■ In the final analysis, we believe that the most that can be said in regard to the clear and convincing evidence standard articulated in the controlling decisions of the Court of Appeals for the Federal Circuit is that a defendant in a patent case must carry a greater burden on an invalidity issue than that required in an ordinary civil case and a lesser burden than that required in the trial of a criminal case. We accordingly reject plaintiff's proposed descriptive label.

In making the findings of fact stated in the next part of this memorandum opinion, we have determined the weight and credibility of the evidence in accordance with what we have stated.

## II. FINDINGS OF FACT

*Nature of the Case and the Parties*

1. This is a suit for infringement of U.S. Letters Patent 3,738,556 entitled "Apparatus for Guiding a Foil Web," arising under the Patent Laws, Title 35, U.S.C.

2. The plaintiff T.W. Kutter, Inc. (Kutter) is a corporation of New Jersey having its principal place of business at 91 Wales Avenue, Avon, Massachusetts 02322.

3. Plaintiff brought this action on May 17, 1983, against defendant Koch Supplies, Inc. (Koch), a Missouri corporation having its principal place of business at 1411 West 29th Street, Kansas City, Missouri 64108. In the complaint Kutter alleged that Koch was guilty of infringement of the patent-in-suit, and prayed for an injunction, damages, and other relief.

4. On June 6, 1983, Koch answered, denying infringement and asserting invalidity of the patent-in-suit, and prayed for appropriate relief.

5. On August 29, 1983, defendant Multivac Sepp Haggenmuller KG (Multivac), a West Germany company having its principal place of business in Wolfertschwenden, West Germany, sought to intervene in this action as a party defendant. Multivac concurrently filed an answer to plaintiff's original complaint, which included a denial of infringement, affirmative defenses predicated upon alleged invalidity of the patent-in-suit, and four counterclaims. Counts I–III of those counterclaims were based upon alleged violations of the antitrust laws (Title 15, U.S.C.), whereas Count IV sought a declaration of non-infringement and invalidity of the patent-in-suit pursuant to Title 35, U.S.C., and Title 28, §§ 2201 and 2202, U.S.C.

6. After consultations between the parties and the Court, Multivac was permitted to intervene as a party defendant (Order of December 26, 1983), but the questions of patent invalidity and infringement were separated for prior trial from Counts I–III of Multivac's answer pursuant to Fed R.Civ.P. 42(b). It was also ordered (June 29, 1984) that the issue of damages be separated from that of liability, again pursuant to Fed.R.Civ.P. 42(b). Accordingly, the issues of patent invalidity and infringement are presently before the Court.

7. Multivac is the manufacturer of the packaging machines (Multivac machines) accused to infringe the patent-in-suit, whereas Koch is the exclusive U.S. distrib-

utor and seller of these Multivac machines in the United States.

### The Patent-in-Suit

#### A. Technological Background

8. The field of the invention is defined in the patent-in-suit. Plaintiff asserts Claim 1 of U.S. Patent No. 3,738,556 (hereinafter "the patent-in-suit") which reads as follows:

A. two first and two second sprockets, each chain being trained about and supported by a first and a second sprocket, said first sprockets being arranged at the upstream end of said apparatus and each being inclined at a small angle with respect to a plane that is normal to the plane of said web and parallel to its direction of travel, the distance between said chains at the location of take-up on said first sprockets being relatively slightly larger than the distance between said chains at the location of run-off from said first sprockets, said second sprockets being arranged at the downstream end of said apparatus; and

B. a foil web guiding drum rotatably supported between said first sprockets running web, said drum being so oriented as to guide said running web along the path of travel of said jaws.

9. The patent-in-suit is used in form, fill and seal packaging machines developed by the respective parties. Such machines are used to package meat, other food products, and medical items and are elongated, inline, multiple-station devices wherein packages are sequentially formed, filled and sealed.

10. Such form, fill and seal machines are provided with a roll of plastic foil presenting a bottom web which is situated at the run-in or infeed end of the machines. The bottom web is sequentially moved through the machine during packaging operations.

The machines may be provided with a pair of continuous, sprocket-supported chains equipped with web grippers and located on either side of the web path. During operation, the grippers are opened at the infeed end of the machine by cam surfaces as they pass around infeed end sprockets, and are caused to close and clamp the side margins of the lower web as they leave the cam surfaces and pass off the infeed end sprockets. The chains are sequentially moved along the length of the machines to thereby guide and shift the gripped lower web in an intermittent fashion through the machine until the run-out or downstream end of the machines is reached. At this point the web grippers are again opened as they pass around the downstream end sprockets, and waste foil material is removed.

11. As the bottom web is sequentially moved by the chain grippers along the length of a machine, it passes through a series of stations. The foil web is heated at one station to render the web formable. The web is then shifted to a die or forming station where one or more pockets are formed in the bottom web. The formed pockets are then shifted to a filling station where the product to be packaged is either manually or automatically placed in the pockets.

12. The filled pockets are then moved to a sealing station where an upper web is attached to form complete, sealed packages. The finished packages are then passed through a cutting station where they are separated as individual packages.

13. The early versions of the Tiromat machines prior to the invention of the patent-in-suit included gripper chains for the web margins. Each chain in those early machines was supported by a pair of sprockets respectively located adjacent the infeed and downstream ends of the machine. Both the infeed and downstream sprockets were vertically oriented and aligned. The early Tiromats had a "push-in" finger located adjacent each infeed end sprocket which served to "snap" the lower web into the chain grippers while the latter were in an open condition.

14. Up until the late 1960's, during the 1970's, and prior to 1971, users of form fill and seal machines predominantly used rela-

tively thin, flexible webs. Those thin webs, because of their flexibility, could readily be "snapped" into the opened web grippers of the Tiromat machines.

15. Beginning sometime in the year 1971, however, thicker or semi-rigid foil webs began to be introduced and have been used in significant amounts for packaging uses in form, fill and seal machines.

16. When the new semi-rigid webs were used in the early existing Tiromat machines, it became apparent that the new semi-rigid webs were very prone to crack and tear as they were "snapped" or inserted into the open grippers of the Tiromats.

17. In order to successfully operate, it is imperative that the machines take up the bottom web without such tearing and cracking. Cracking or tearing of the web could prevent the machine from making proper packages and the machine would thus become inoperative for its intended purpose.

18. Tiromat customers began to complain about cracking and tearing of the new semi-rigid webs. A number of unsuccessful attempts were made to solve the problem. Mr. Ludwig Grebe was involved in the attempts to modify the early Tiromat machines.

19. Mr. Ludwig Grebe eventually had the idea of inclining the infeed end sprockets on the machines so that the gripper chains would start at the lower region of the infeed end sprockets laterally spaced from the adjacent web margins, and then progressively converge as the chains traveled around the infeed end sprockets until the opened grippers supported by opposed chains received the web margins. As the grippers closed, they would clamp the web margins.

20. This idea effectively solved the problem of semi-rigid web take-up at the infeed end of the Tiromat machines. The invention was thereafter installed as a standard feature on all Tiromat machines. No further customer complaints about web takeup were registered after the invention was adopted.

21. The patent-in-suit, No. 3,738,556 (hereinafter "the '556 patent") states that this invention relates to a device for guiding a foil web in packaging machines by means of jaws engaging the web along both lateral edges.

22. The '556 patent made reference to the following four patents as prior art:
   a. U.S. Patent No. 3,673,760 to Canamero, entitled "Packaging Method and Apparatus";
   b. U.S. Patent No. 3,469,819 to Puretic, entitled "Net Retriever Apparatus";
   c. U.S. Patent No. 3,517,479 to Pinkham, entitled "Wrapping Machine";
   d. U.S. Patent No. 3,286,817 to Brigham, entitled "Chain Carrier Clip".

23. Counsel have proposed a substantial number of findings of fact which did no more than paraphrase the portions of the patent that stated the background of the patent, the object and summary of the invention, its brief description of the drawing, its description of the preferred embodiment of the invention, and the claim of invention. We find that the patent speaks for itself and that the disagreements of counsel in regard to how the portions of the patent should be paraphrased need not be resolved.

24. The parties are agreed that the drawings of the '556 patent depict in exaggerated form the inclined sprocket arrangement described in the patent and we so find.

### Prosecution History of the Patent-in-Suit

25. The U.S. application which matured as the patent-in-suit was filed in the United States Patent and Trademark Office on May 10, 1972, and was accorded Serial No. 251,915. During the pendency of said U.S. application a claim for priority was filed based on the corresponding application filed in Germany on May 11, 1971 (application No. P21 23 133.4), and this application later matured as a German patent.

26. The U.S. application lists Ludwig Grebe of Wallau/Lahn, West Germany,

now deceased, as inventor. The Examiner in charge of the Grebe U.S. application specifically found that the conditions for priority based upon German application P21 23 133.4, filed May 11, 1971, had been met. During prosecution of the U.S. application, a specific claim for priority was made; and a certified copy of the priority document was filed.

27. The U.S. application as originally filed contained two claims. In an Office Action dated February 5, 1973, the two claims were allowed as filed without amendment.

28. During prosecution, the U.S. Patent and Trademark Office requested, under the U.S.-German Search Exchange, the results of the search made by the German Patent Office against the corresponding German application; the German Patent Office complied, and reported the prior art found during its search.

29. The primary Examiner of the patent-in-suit was Mr. Allen N. Knowles. His assistant was Mr. G.A. Church. Mr. Church did not have authority to allow the U.S. application, without the approval of Mr. Knowles.

30. Despite the two independent prior art searches conducted by the U.S. and German Patent Offices, the claims were allowed as filed, and the U.S. patent issued on June 12, 1973 as Patent No. 3,738,556.

### Ownership of the Patent-in-Suit

31. Kutter is the owner of U.S. Patent No. 3,738,556 and is entitled to recover for past infringement thereof. Such ownership on the part of Kutter has been admitted by defendants.

### Priority Based Upon German Application P21 23 133.4, Filed May 11, 1971

32. During prosecution of the application which matured as the patent-in-suit, a claim for priority under 35 U.S.C. § 119 was made, based upon West German application P21 23 133.4, filed May 11, 1971.

33. West Germany is an eligible foreign country under 35 U.S.C. § 119 and is a signatory to the Paris Convention for the Protection of Industrial Property, i.e., it is a foreign country which affords similar priority privileges in the case of applications filed in the United States.

34. The U.S. application which matured as the '556 patent was filed within twelve months of the filing date of the German application.

35. The German application upon which the claim for priority was based was an application for a German patent.

36. German application P21 23 133.4 was filed in the name of Kramer & Grebe KG Maxchinen-und Modellfabrik, the assignee of the U.S. applicant, Mr. Ludwig Grebe.

37. German application P21 23 133.4 is for the same invention as the U.S. application which matured as the patent-in-suit.

38. Defendants adduced no evidence that the original German application failed to meet the requirements of 35 U.S.C. § 112.

39. U.S. Patent No. 3,738,556, and all claims thereof, is entitled to the benefit of priority under 35 U.S.C. § 119, based upon German application P21 23 133.4, filed May 11, 1971.

### Validity of the Patent-in-Suit

40. Defendants Multivac and Koch assert that Claim 1 of the '556 patent is invalid under 35 U.S.C. §§ 102 and 103.

41. Defendants rely upon the following alleged prior art in support of their contentions of invalidity:

Patents

| U.S. Patent No. | Date | Patentees |
| --- | --- | --- |
| 754,659 | 02/15/04 | Gessner |
| 3,286,817 | 11/22/66 | Brigham |
| 3,469,819 | 09/30/69 | Puretic |
| 3,517,479 | 06/30/70 | Pinkham |
| 3,673,760 | 07/04/72 | Canamero |

### Alleged Prior Sales or Uses

Multivac R–70 Machine No. 389 sold to Hans Mueller Sausage Co., Dallas, Texas (hereinafter the "Mueller machine").

Multivac R–70 Machine No. 667 allegedly sold in March, 1972 (hereinafter the "Peschke machine").

42. The patents to Canamero and Puretic were cited by the Examiner during prosecution of the U.S. application. The patents to Pinkham and Brigham were brought to the attention of the U.S. examiner in the Grebe application by virtue of the examination report from the German Patent Office. The U.S. examiner found the claims of the '556 patent to be patentable over the teachings of all four of the aforementioned patents.

43. The only patent not specifically of record in the file history of the patent-in-suit is the 1904 patent to Gessner, No. 754,659.

44. The Gessner patent claimed invention of a new and useful improvement in cloth holding devices for textile machinery.

45. The Gessner patent does not in any way relate to an apparatus for guiding a running foil web; it relates to a device to handle stretchable cloth.

46. Use of diverging side chains as described in the Gessner patent, would be inoperative if used in the context of a packaging machine using a plastic foil web.

47. Use of pin-type cloth impaling devices as disclosed in the Gessner patent would not be operable in the context of a packaging machine using a running foil web—in fact, such impaling devices would defeat the entire purpose of the improvement of the patent-in-suit, i.e., avoidance of cracking or tearing of the plastic foil web.

48. The Gessner device differs in a number of crucial ways from the invention claimed in the patent-in-suit.

49. The Gessner patent is non-analagous to the invention of the patent-in-suit, and is therefore not properly a part of the relevant prior art.

50. Even if considered to be relevant prior art, the teaching of the Gessner patent did not anticipate or render obvious the invention claimed in the patent-in-suit.

51. Mr. Gene Church, formerly employed by the Patent Office, was permitted to testify as a defendants' witness, subject to plaintiff's objection stated of record. Mr. Church testified that the Gessner patent was not known or considered by him; that the Gessner patent discloses a device within the scope and content of prior art; and that the Gessner patent teaches claimed inclined sprocket wheels to assist in the feeding of material.

We find, however, that Mr. Church's testimony must be rejected. For we find that he was not a credible witness. In addition, we find that Mr. Church was not qualified as a technical expert and that he was not one skilled in the art. Indeed, Mr. Church's comments about the Gessner patent, in our view, amounted to nothing more than speculation on the part of an unqualified witness. In light of our rejection of Mr. Church's testimony, it is not necessary that we rule plaintiff's objection.

52. Defendants have failed to meet their burden of overcoming the presumption of validity of the claims of the patent-in-suit based upon the Gessner patent.

### Hans Mueller Machine

53. Defendant relies on the Hans Mueller machine as prior art that was not known to the Patent Office.

54. The Hans Mueller machine, No. 389, is an R–70 model machine produced by defendant Multivac and sold by defendant Koch in the United States.

55. The Hans Mueller machine was first purchased by Koch in July, 1970 for an industry AMI (American Meat Institute) show in Chicago in October, 1970. Mr. Starr, president of Koch, testified and we find that he "never heard of an orientation of an infeed sprocket" until October, 1982.

56. The R–70 machine, Serial No. 389, displayed at the AMI show was purchased at that time by Mr. Hans Mueller, owner of Hans Mueller Sausage Company of Dallas, Texas. This was one of the first R–70's sold by Koch in the United States. The machine was sent directly from the AMI

show to the Hans Mueller Sausage Company located in Dallas, Texas.

57. Defendants rely on testimony given by Hans Mueller in regard to whether the Hans Mueller machine had ever used rigid film and whether he observed that machine running rigid film at the AMI show in 1970. We find that the only credible testimony given by Mr. Mueller in regard to the type of film used in the Hans Mueller machine was his testimony that he used flexible film ever since he bought the machine, using a brand known as Cryovac or Clearwood (Tr. 228). We further find that his testimony concerning the Hans Mueller machine's use of rigid film is not credible under the clear and convincing evidence standard.

58. Defendants failed to adduce any credible evidence that the Hans Mueller machine will actually accept semi-rigid webs, and therefore failed to establish a reduction to practice of the machine.

59. Mr. Mueller did not make any measurements on the machine in 1970 or thereafter.

### The Relevant Constructional Details of Multivac R–70 Machines

60. An important question vis-a-vis the Mueller machine is the intentional configuration of that machine in 1970. Directly relevant to that inquiry are contemporaneous drawings and other documentary evidence which reflect the manner in which the R–70 machines were to be constructed.

61. The following drawings and documents depict and describe how the R–70 machines were to be constructed in the relevant time period:

| Description | Trial Exhibit No. | |
|---|---|---|
| Operator side sideframe | P–187 | P–96, p. 140 |
| Drive side sideframe | P–162 | P–96, p. 116, 117 |
| Sketch of sideframe with extension | P–163 | P–96, p. 127 |
| Operator side infeed sprocket | P–166 | P–96, p. 119 |
| Operator side eccentric | P–156 | P–96, p. 124, 125 |
| Operator side sprocket assembly | P–155 | P–96, p. 125 |
| Drive side infeed sprocket | P–170 | P–96, p. 123 |
| Drive side eccentric | P–173 | P–96, p. 124 |
| Drive side sprocket assembly | P–171 | P–96, p. 123, 124 |

| Description | Trial Exhibit No. | |
|---|---|---|
| Infeed roller | P–167 | P–96, p. 119 |
| Infeed roller mount | P–168 | P–96, p. 122 |
| Infeed roller mount | P–169 | P–96, p. 122 |
| Chain gripper | P–159 | P–96, p. 117 |
| Chain bracket for gripper | P–160 | P–96, p. 117 |
| Lower web infeed system | P–190 | P–96, p. 198 |
| R–70 operator's manual | P–174 | P–96, p. 118 |

62. All of the documents set forth in Finding 61 are contemporaneous in time with the intended construction of the Hans Mueller machine and show the constructional details of R–70 machines produced at or about the time of the construction of the Hans Mueller machine.

63. None of the documents set forth in Finding 61 depict or describe any inclined infeed end sprockets. Mr. Brenne, Multivac's president, testified, and we accept his testimony, that there were no documents of any nature in the files of Multivac which would, in any way, tend to show an inclined infeed end sprocket for an R–70 machine.

64. We also accept the testimony of Multivac's engineer, Mr. Natterer, that all of the so-called "early" R–70 machines produced by Multivac prior to any alleged hand grinding operations discussed below had conventional, vertically oriented infeed end sprockets.

65. The only contemporaneous documents offered in evidence by the defendants in regard to the Hans Mueller machine did no more than establish that the machine in question was manufactured in 1970; that the machine was sold to Koch for display at the 1970 AMI show; and that the machine was ultimately sold to Hans Mueller Sausage Company. That factual data have never been in dispute and do not support defendants' claims of invalidity.

66. The contemporaneous Mueller machine documents also do not recite explicitly that the Mueller machine was constructed for use with semi-rigid webs.

67. It is thus clear that none of the contemporaneous documents relating to the Hans Mueller machine can be said to establish that in 1970 the machine was intentionally equipped with inclined infeed end sprockets, or that the machine was designed to accept semi-rigid web.

*Multivac's Alleged Modifications to R–70 Machines*

68. Defendants contend that they have, in fact, carried the burden of establishing by clear and convincing evidence that the Hans Mueller machine had been intentionally altered and thus became provided with all elements of Claim 1 of the patent-in-suit before and at the time that machine was sold in the AMI show in Chicago in 1970.

Paragraph 26 of defendants' proposed post-trial findings of fact proposed an ultimate finding of fact that the Hans Mueller machine, in fact, contained the claimed inclined sprockets at the time the machine was displayed and sold at the AMI show in Chicago in 1970. Defendants based that proposed ultimate finding on the findings of fact defendants proposed in paragraphs 20–25 of their proposed post-trial findings of fact. Those proposed findings of fact were based on testimony given by Peter Gabrisch, a mechanic in Multivac's final assembly station.

In a similar manner, paragraph 50 of the defendants' proposed post-trial findings of fact, based on the underlying findings of fact proposed in paragraphs 27–49 thereof, proposed that the Court make an additional ultimate finding of fact that the defendants had adduced ample corrobative evidence to support Mr. Gabrisch's testimony that the Hans Mueller machine contained the claimed inclined sprockets at the time it was displayed and sold in Chicago in 1970.

Paragraphs 27–49 of defendants' proposed post-trial findings of fact were generally based on four sets of *ex parte* measurements of the claimed inclined sprockets on the Hans Mueller machine made by Joe Clark on November 3, 1982, by Hans Natterer on November 23, 1982, by Professor George Forman on November 26, 1982 and on August 20, 1984; on particular testimony given at trial by Hans Mueller and Hans Natterer; and on the deposition testimony of witnesses Medwed, Janisse and Lockard.

69. This court must determine whether defendants have carried the burden of proving facts compelling a conclusion of patent invalidity under the evidence adduced at trial.

70. We find that defendants have failed to carry the burden of proving invalidity by clear and convincing evidence. It is appropriate that we make a number of additional findings of fact that will reflect why we cannot find that defendants carried the burden imposed by the clear and convincing standard of proof.

71. No contemporaneous documents or records of any sort exist which would corroborate the testimony of Messrs. Medwed and Gabrisch that they were instructed to hand grind any R–70 sideframe extensions. Nor do any contemporaneous documents or drawings exist which depict or describe inclined faces on the extension faces of R–70 machines and/or inclined sprockets on such machines.

72. Mr. Medwed testified, and we accept that testimony, that a number of R–70 machines were *not* ground, and were therefore sent to customers with upright sprockets. Mr. Brenne also testified, and we accept that testimony, that in the 1970 time period Multivac sold a number of R–70 machines with upright sprockets.

73. Multivac produced no documents which would tend to establish that in 1970 it was Multivac's policy to demonstrate rigid film machines at trade shows.

74. All testimony adduced by the defendants about the alleged grinding of any R–70 machine sideframe extensions was given by interested witnesses, i.e., persons in the employ of Multivac.

75. There was a substantial and significant delay (15 years) between the alleged modification of R–70 machines and trial. Defendants adduced no documentary evidence that could have come into being during that long interval of time that made any reference to events that are now alleged to have occurred fifteen years ago.

76. No corroboration evidence was adduced from any independent, non-interested witness.

77. The fact that Gabrisch may have stamped the Hans Mueller machine with

his initial "G", and we are inclined to believe that he did, does not support a finding of fact that he, in fact, inclined the sprockets on that machine. The most that stamped initial could show was that he may have done some testing and adjustment of that particular machine.

78. We are fully satisfied that the oral testimony of the defendants' witnesses failed to establish by clear and convincing evidence that any R–70 machines were intentionally provided with inclined infeed end sprockets in 1970 or that the Hans Mueller machine was so modified before it was sold in 1970.

79. Plaintiff objected to the admission of any evidence of defendants' 1982–84 measurements of the Hans Mueller machine on grounds fully stated of record. The Court allowed the defendants to adduce that evidence subject to plaintiff's objection.

80. It is not necessary that we rule plaintiff's objection for the reason that we were not impressed with the credibility defendants' measurement evidence. Specifically, we find that defendants' measurement evidence did not meet the applicable clear and convincing standard of proof. The evidence adduced in regard to the European machines particularly lacked credibility.

81. In regard to the measurements of the Hans Mueller machine, we find that defendants made at least four separate measurements during the period 1982–1984 and that all were made after formal notice of infringement was received. Plaintiff was not invited to be present and was not, in fact, present at any of the measurements.

82. Paragraphs 45 and 46 of defendants' proposed post-trial findings of fact were proposed in support of their factual argument that plaintiff's expert testimony should be rejected. Those paragraphs requested that we find that plaintiff "took no direct measurements" of the inclination of the sprockets or of the inclination of the faces of the bosses on the Hans Mueller machines." (Defendants' emphasis). Para-

graphs 46 and 47 of defendants' proposed post-trial findings of fact also requested findings that "all direct measurements" made by the defendants established that the Hans Mueller machine did, in fact, have the claimed inclined sprockets and that the faces of the bosses were, in fact, inclined. (Defendants' emphasis).

Defendants' proposed findings of fact reflect defendants' view that the conflict in the measurement testimony should be considered as a battle between the expert witnesses called by the respective parties. Defendants contend, in effect, that if defendants are able to persuade the trier of the facts that the testimony of plaintiff's expert witness Gladow should be rejected for the reason he made no direct measurements, then the testimony of defendants' witnesses, based on their direct measurements, should be accepted. We find that factual argument untenable.

While we find that plaintiff's expert witness Gladow was, in fact, the more credible measurement witness, we further find that the measurement testimony adduced by the defendants fails to carry the burden of proof under the applicable clear and convincing standard.

83. Defendants direct attention to Gladow's testimony on page 639 of the transcript where Gladow freely conceded that "I did not make a single direct measurement [to determine whether or not the sprockets were inclined] ... as done by Mr. Natterer or Mr. Forman." Gladow made clear, however, that he "made many other [measurements] which indicated that such a [direct] measurement would be unreliable and would simply be measuring the other factors which had previously been measured." (Tr. 639).

We find that Gladow's explanation accurately stated one of the reasons that supports our finding that defendants failed to carry the burden of proof under the clear and convincing standard in regard to its measurement testimony.

85. Consistent with its direct measurement factual argument, paragraph 49 of

defendants' proposed post-trial findings of fact requests a finding that the *"direct* measurements of the German Court-appointed expert on the R–70 No. 465 machine reveal inclined faces of the bosses and claimed inclined sprockets on the machine." (Defendants' emphasis). We find that defendants' factual argument in regard to the R–70 No. 465 machine fails to meet the clear and convincing evidence standard and, accordingly, we reject defendants' proposed finding of fact in regard thereto.

86. On January 28, 1986, defendants' counsel forwarded certified copies and translations of certain documents filed in the patent proceeding that presently pends in the German court. In response to that letter, plaintiff's counsel on February 11, 1986 forwarded copies of additional documents and translations filed in the German patent proceedings. We do not believe any of those documents may properly be considered in the determination of this case. None have been admitted in evidence. Even if the case had, upon appropriate motion, been reopened to admit the documents in evidence, we find from our examination of the documents that they would not support paragraph 49 of defendants' proposed post-trial findings of fact.

87. We find that Hans Natterer's testimony in regard to his alleged measurements of the machines identified in paragraph 33 of defendants' proposed post-trial findings of fact and Jousisse's deposition testimony in regard to the British R–70 No. 666 machine identified in paragraph 38 of defendants' proposed post-trial findings of fact must be rejected under the clear and convincing standard of proof applicable to this case. Such testimony simply did not establish an abiding conviction in this factfinder that it was "highly probable" that the testimony of those two witnesses in regard to the identified machines was true.

88. Paragraph 39 of defendants' proposed post-trial findings of fact request that we make a finding based on the deposition testimony of Tom Lockard that he measured the Peschke R–70 machine No.

667; that he found that the machine was equipped with claimed inclined sprockets; and that his measurements should be considered as a confirmation of Natterer's measurements of the same machine. Defendants contend that those measurements should be considered as corrobative evidence to Gabrisch's testimony. (See page 8 of defendants proposed post-trial findings of fact).

89. We find that defendants' evidence in regard to the Peschke machine is both unclear and unconvincing. We therefore find that it cannot be considered as corrobative evidence either in regard to Natterer's measurements or in regard to Gabrisch's testimony.

90. In the first place, the Peschke machine cannot be considered to be prior art against the claims of the patent because defendants' Exhibit 67 establishes that the delivery date for that machine was March 16, 1972 which fixed a date of sale after the May 11, 1971 priority date accorded the patent-in-suit.

91. In the second place, even if the sale of the Peschke machine could be said to have occurred before the priority date fixed for the patent-in-suit, we find that testimony offered by defendants in regard to that machine has failed to meet the burden of proof with respect to that machine.

92. We find that defendants adduced no contemporaneous documentary evidence which could be said to establish that the Peschke machine as sold was equipped with inclined sprockets.

93. There is no question that in November, 1982, after notice of infringement, Lockard, who was a Koch serviceman, was asked to look at the Peschke machine to ascertain the configuration of the sprocket assemblies of that machine.

94. Lockard testified in his deposition, however, that he was not "trying to make a precision measurement" and that he really was only "trying to get a rough idea." (P–386, p. 53–54). He further testified that he was only "doing a real quick checkover"

and that "absolutely" he was not making a precision measurement.

95. Lockard testified that he did not intend to quantify the magnitude of any inclination that may have been on the Peschke machine. He characterized his work as "... very sloppy measurement." (P–386, p. 58).

96. Under the circumstances, we find that defendants have failed to carry the burden of establishing that the Peschke machine as manufactured and sold had inclined sprockets. The evidence adduced by the defendants in regard to the Peschke machine was not persuasive under any standard of proof.

97. Accordingly, the Court finds that the defendants have failed to overcome the Section 282 presumption of validity of the patent-in-suit or to otherwise prove the invalidity of the claims of the patent-in-suit.

*Findings on the Issue of Obviousness*

98. Section 103 of Title 35, United States Code, requires the Court to determine whether the difference between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. The parties are generally agreed that under the circumstances of this case a person of ordinary skill in the field of the patent-in-suit would need to have a degree in mechanical engineering, or equivalent experience in the field of the patent. (See paragraph 60 of defendants' proposed post-trial findings of fact and plaintiff's cross-fire response to that paragraph).

99. We find that the record in this case establishes that those skilled in the art, as of 1971, took pains to ensure that sprocket drive assemblies were aligned with one another and that such assemblies were not to be inclined. We find that conventional engineering practices train engineers to think in "right angles"; the concept of inclined sprockets is thus foreign to such practices and training.

100. Instructions from chain manufacturers emphasized that care should be taken in aligning sprockets, and that misalignment was to be avoided. In like manner, packaging machinery texts and books on design and use of chain and sprocket drives admonished those skilled in the art to properly align sprockets to avoid undue wear and other problems.

101. Plaintiff introduced a number of patents in evidence which related to packaging machines and methods of forming packages. Three of those patents were concerned with packaging machinery making use of plastic webs, and include sprocket-mounted side gripper chains. Patent No. 3,029,007 (Hepner) describes the use of horizontal sprockets. Patent Nos. 3,303,-628 (Lovas and DiMonico) and 3,347,011 (also Lovas and DiMonico) describe vertical sprocket arrangements. None of those patents teach or suggest the idea of inclined sprockets. Both of the Lovas and DiMonico patents depict the use of vertical sprockets and snap-in fingers in much the same manner as the prior Kramer & Grebe machines which also made use of conventional vertical sprockets.

102. Examination of the patents identified in finding 101 would lead one skilled in the art away from rather than toward the inclined sprockets described and claimed in the patent-in-suit.

103. The parties are agreed that a classic hallmark of invention is "going against the grain" of the prior art; in striking out in a direction thought by others to be avoided. We find that the present invention disregarded the teachings of the prior art, and achieved a new and important result by ignoring the admonitions of such prior art.

104. We find that defendants failed to carry the burden of proving the invalidity of the claims of the patent-in-suit as asserted under Section 103. We find that it would not have been obvious to a person having ordinary skill in the art to provide any of the defendants' R–70 machines, including but not limited to the Hans Mueller machine, with inclined sprockets.

105. The invention of the patent-in-suit has been a commercial success. Since 1972, and until August, 1984, Kremer & Grebe sold over 750 machines having the inclined sprocket feature in the United States alone.

106. Defendants admit that Multivac form, fill and seal machines have been commercially successful. Defendants also admit that they have sold several hundred of the models (Models R–7000, R–5000, R–5100, R–80, and M855D) which they admit are infringing the patent-in-suit. These types of machines sell for prices in the neighborhood of one hundred thousand dollars each, although depending upon the features, the price may be higher or lower.

### Enforceability of the Patent-in-Suit

107. Defendants did not propose any findings of fact to support the allegation of Multivac's answer that pleaded laches and estoppel. Defendants did, however, propose several conclusions of law in connection with that pleaded issue. In order that any factual dispute be resolved, we find that plaintiff learned of defendants' infringement in February or March of 1982; that defendants were made aware of the patent-in-suit in October 1982; and that suit was brought on May 17, 1983. We further find that defendants failed to make any showing that they suffered any prejudice by the death of the single witness mentioned during trial. We find that no inference of laches or estoppel can arise under such factual circumstances and accordingly find that the patent-in-suit is enforceable.

### Infringement

108. The patent-in-suit contains two claims. Plaintiff only charges and accuses defendants of infringement of Claim 1. The plaintiff does not charge infringement of Claim 2.

109. The parties have stipulated that certain models of defendants' form fill and seal machines (R–7000, R–5000, R–5100, R–80 and M855D) manufactured and sold by defendants infringe Claim 1 of the patent-in-suit, if valid.

110. In view of the findings of validity and enforceability herein, we find that defendants are liable for infringement of Claim 1 of the patent-in-suit.

111. Both sides have proposed findings of fact which respectively request that an ultimate finding of fact be made in their favor; that this case is an "exceptional" case within the meaning of 35 U.S.C. § 285; and that each are accordingly entitled to attorney fees. We find that this case is not an "exceptional case" within the meaning of the statute.

### III. CONCLUSIONS OF LAW

1. The Court has personal jurisdiction over the parties to this action. The Court has subject matter jurisdiction over plaintiff's claims of patent validity and infringement by virtue of 28 U.S.C. § 1338(a), and over defendants' counterclaims for patent invalidity and non-infringement by virtue of 28 U.S.C. § 2201(a). Venue is proper pursuant to 28 U.S.C. § 1400(b) and 28 U.S.C. § 1391(c).

2. The patent-in-suit is presumed to be valid as provided in 35 U.S.C. § 282. Defendants, having asserted the invalidity of the patent-in-suit, have the burden of establishing invalidity under the clear and convincing standard of proof. That burden of proof never shifts.

3. The defendants have failed to adduce sufficient credible evidence to overcome the presumption of validity of the patent-in-suit. 35 U.S.C. § 282.

4. Oral testimony of alleged prior use, unsupported by contemporaneous documents, must be subjected to appropriate scrutiny under the clear and convincing standard of proof. We conclude that Mr. Peter Gabrisch's testimony that he personally inclined the sprockets on the Hans Mueller machine in 1970, was unsupported by any contemporaneous documents, and that his testimony otherwise failed to meet the standard of proof applicable to this case.

5. We conclude that defendants' evidence concerning measurements made on the Hans Mueller machine in 1982–1984 cannot, under the findings of fact above-stated, be said to corroborate the oral testimony of Mr. Gabrisch as to the inclination of the in-feed sprockets on that machine in 1970. Similar findings of fact were made in regard to the measurement of other R–70 machines manufactured by the same manufacturer as the Hans Mueller machine. We conclude that defendants failed to carry the burden of proof imposed on them under the clear and convincing evidence standard of proof in regard to their measurement evidence.

6. We conclude that the defendants failed to prove by clear and convincing evidence that the Hans Mueller machine was intentionally provided with each and every element of Claim 1 of the patent-in-suit arranged in the same way at the time the machine was sold in the United States in 1970, more than one year prior to the filing date of the patent-in-suit. Accordingly, we conclude that the defendants have failed to carry the burden of proving the invalidity of Claim 1 of the patent-in-suit under 35 U.S.C. § 102(b). The same conclusion is applicable to the Peschke and the other R–70 machines concerning which the defendant adduced evidence.

7. The non-obviousness requirement of the patent laws is set forth in 35 U.S.C. § 103. In determining whether a claimed invention would have been obvious under Section 103, the Court determines: (a) the scope of the prior art; (b) the differences between the prior art and the claim at issue; and (c) the level of ordinary skill in the art.

In addition, any secondary evidence in the case bearing on the obviousness issue must be considered. *Graham v. John Deere Co.*, 383 U.S. 1, 16, 86 S.Ct. 684, 693, 15 L.Ed.2d 545 (1966).

8. Under the findings of fact above-stated, we conclude that neither the Hans Mueller machine nor any other of defendants' R–70 machines may properly be considered to be prior art to the patent-in-suit under Section 103.

9. U.S. Patent No. 754,649 was filed and issued to Gessner before the filing date of the application for the patent-in-suit. Defendants contend that the Gessner patent should be considered as prior art to the patent-in-suit under 35 U.S.C. § 102(e). We find and conclude that the Gessner patent does not teach the use of the inclined sprockets of Claim 1 of the patent-in-suit and that none of the teaching of that patent is within the scope of the art to which said Claim 1 pertains.

10. We find and conclude under the findings of fact above-stated, and after our consideration of the invention defined by Claim 1 as a whole, that the defendants have failed to carry the burden of proving that a person of ordinary skill in the art would have found the alleged invention of Claim 1 to be obvious at the time of its making within the meaning of 35 U.S.C. § 103.

11. Under the findings of fact above-stated, we conclude that defendants have failed to establish under the applicable standard of proof that either equitable doctrine of laches or estoppel may properly be applied in this case.

12. We conclude that the defendants have failed to carry their burden of proving the invalidity of Claim 1 of the patent-in-suit under 35 U.S.C. § 102(b) by clear and convincing evidence.

13. We conclude that the defendants have failed to carry their burden of proving the invalidity of Claim 1 of the patent-in-suit under 35 U.S.C. § 103 by clear and convincing evidence.

14. We conclude that defendants have failed to overcome the presumption of validity of the patent-in-suit established by 35 U.S.C. § 282.

15. We accordingly find and conclude that Claim 1 of the patent-in-suit, U.S. Patent No. 3,738,556 to Grebe, should be and the same is hereby declared and adjudged to be valid. In accordance with the stipulation of the parties, we further find and

conclude that defendants have infringed Claim 1 of the patent-in-suit and that defendants are liable to plaintiff for that infringement.

16. We find and conclude that this case is not an exceptional case within the meaning of 35 U.S.C. § 285.

## IV. MEMORANDUM AND ORDERS DIRECTING FURTHER PROCEEDINGS

The separated issues of validity and infringement of the patent-in-suit are decided in favor of the plaintiff by what has been said above. In order that appellate procedural difficulties be avoided, it is therefore appropriate that the views of counsel be obtained in regard to what form of judgment should be entered pursuant to Rules 54 and 58 of the Federal Rules of Civil Procedure. For the form in which judgment is entered will have a direct impact on whether defendants may notice an appeal pursuant to 28 U.S.C. § 1292(a)(1) as a matter of right or whether defendants would be required to notice a discretionary appeal under 28 U.S.C. § 1292(b) and seek an express determination of this Court under Rule 54(b) of the Federal Rules of Civil Procedure that would state that there is no just reason for delay in hearing a Section 1292(b) appeal.

The attention of counsel is directed to the fact that the Court has not yet determined that defendants "are still infringing" Claim 1 of the patent-in-suit; nor has the Court yet concluded that "defendants are therefore ... enjoined from further infringement," as plaintiffs proposed in paragraphs 12 and 13 of plaintiff's post-trial proposed conclusions of law.[10]

We did not accept plaintiff's proposed conclusion of law that defendants should be enjoined from presently infringing Claim 1 of the patent-in-suit for the reason that defendants placed the question of defendants' present infringement in factual dispute. Defendants stated in their cross-fire response to paragraph 12 of plaintiff's post-trial conclusions of law that the "parties have never stipulated that the defendants are still infringing Claim 1 and the defendants deny this." Review of the parties' stipulation establishes that the language of the stipulation was not broad enough to cover the question of present infringement; hence, we limited our findings and conclusions to cover only past infringement.

Should defendants withdraw their apparent narrow reading of the stipulation and state of record that at least some present infringement exists as a matter of fact, and further agree of record that plaintiff is therefore entitled to injunctive relief in regard to such present infringement, there would be little doubt that defendants could notice an appeal as a matter of right pursuant to 28 U.S.C. § 1292(a)(1) from any judgment this Court might enter that would grant an injunction against present infringement.

On the other hand, defendants may not wish to withdraw their denial of present infringement as stated in their cross-fire. In that event, several procedural alternatives would come into play: (a) the question of whether defendants are, in fact, presently infringing Claim 1 could be set for separate hearing so that the plaintiff's claim of present infringement and for interlocutory injunctive relief could be determined on the facts or (b) the parties might agree on the entry of a judgment that would reflect the parties' agreement that an appeal noticed under Section 1292(b) would "materially advance the ultimate determination of the litigation" within the meaning of that statute.

The Court in the latter event would, of course, be required to make an appropriate determination under Rule 54(b) that there

---

10. We have only thus far found in paragraph 110 of our findings of fact that "defendants are liable for infringement of Claim 1 of the patent in suit." And we stated substantially the same thing in paragraph 15 of our conclusions of law.

The issue of defendants' liability for damages for infringement has, of course, been separated for separate trial pursuant to Rule 42(b) in accordance with the stipulation of the parties.

is no just reason for delay in hearing the noticed Section 1291(b) appeal. It is clear, however, that under those circumstances, the Court of Appeals would have to exercise its discretion in favor of the defendants in order to permit an appeal under Section 1292(b).

There are other practical considerations that the Court is confident that counsel for the parties may wish to consider in regard to what further proceedings should presently be directed that would lead to the ultimate final determination of this case. Orders will therefore be entered to obtain the views of counsel under the circumstances.

Accordingly, it is

ORDERED (1) that in accordance with the last sentence of Rule 58 of the Federal Rules of Civil Procedure counsel are directed to submit for approval of the Court a form of judgment to be entered in this case. It is further

ORDERED (2) that in order to give counsel an opportunity to reach an agreement in regard to the form of judgment to be entered and in regard to what further proceedings that may need to be directed, counsel are directed:

(a) To promptly schedule a conference of counsel for the purpose of attempting to reach an agreement (1) in regard to the form of judgment to be entered and (2) in regard to any further proceedings that may need to be directed under the circumstances.

(b) If counsel are able to reach an agreement, such agreement, together with any proposed orders and a proposed form of judgment shall be presented to the Court for its approval on or before April 30, 1986.

(c) In the event counsel are not able to reach agreement, each party shall separately prepare, serve, and file their respective proposed orders and proposed form of judgment, together with a short statement in support of their respective positions, on or before April 30, 1986.

(d) If the parties agree that a short extension of time beyond the April 30, 1986 deadline above-stated should be granted, they shall present for approval of the Court an agreed order extending that deadline.

(e) In the event counsel agree that a conference with the Court would contribute to counsels' efforts to reach agreement, such a conference, upon the written request of counsel made prior to the April 30, 1986 deadline, will be promptly scheduled at a time convenient to the Court and counsel. Any request for a conference with the Court shall include an agreed agenda of the matters counsel wish to have considered at the requested conference.